[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11995
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cr-00032-DHB-BKE-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANDREW GARETH NELSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(June 4, 2015)

Before TJOFLAT, HULL and WILSON, Circuit Judges.

PER CURIAM:

After a jury trial, defendant Andrew Nelson appeals his convictions and sentences for armed bank robbery and using, carrying, and brandishing a firearm during a crime of violence.  Following a careful review of the record and briefs, we affirm in part and dismiss the appeal in part.

## I.  BACKGROUND

At trial, Nelson admitted the offense conduct charged but claimed insanity based on his bipolar disorder and alleged inability to remember committing the robbery.  We therefore only briefly discuss the evidence of Nelson's offenses and then more extensively discuss his development and presentation of an insanity defense.

### A.    Offense Conduct

On January 5, 2013, Nelson entered a Wells Fargo bank in Martinez, Georgia, carrying a duffel bag and wearing all black, including a hood, a mask, gloves, and sunglasses.  Nelson brandished a fully loaded 9-millimeter pistol upon entering the bank and demanded that the bank tellers load money "with no dye packs" into his duffel bag.  After the bank tellers placed $2,357 in cash in the bag, along with a dye pack, Nelson fled the bank on foot into nearby woods.

Meanwhile, based on a silent alarm call from the bank, law enforcement officers responded to the scene and established a perimeter around the bank.  Within minutes of the silent alarm call, officers located and detained Nelson near

the woods by the bank.  Nelson's 9-millimeter pistol and hands appeared red from an apparent explosion of the dye pack.

From the woods near the bank, officers recovered Nelson's duffel bag, which contained the money from the robbery covered in red dye, a jacket doused in Clorox bleach, a fully loaded magazine that fit the 9-millimeter pistol, and a mask. Subsequently, law enforcement found Nelson's Mercury Marquis parked across the street from the bank and learned that Nelson purchased both the pistol and the mask within two days before the robbery.

## B.    Indictment and Appointment of Counsel

On February 7, 2013, a grand jury indicted Nelson for one count of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and one count of using, carrying, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

Nelson submitted an affidavit of indigency, and the district court appointed an attorney to represent him pursuant to the Criminal Justice Act ("CJA").

## C.    Pre-Trial Competency and Sanity Examinations

After pleading not guilty, Nelson provided notice of his intention to pursue an insanity defense and filed an unopposed motion for a psychiatric or psychological examination to determine competency and sanity.  In support of the motion, Nelson alleged that he suffered Post–Traumatic Stress Disorder ("PTSD")

3

while in the Air Force.  A magistrate judge granted Nelson's motion for a psychiatric or psychological evaluation, and Nelson was subsequently evaluated at the Metropolitan Correctional Center ("MCC"), a federal prison in New York.

MCC forensic psychologist Dr. Kari Schlessinger prepared lengthy competency and criminal responsibility reports that were submitted to the district court on June 10, 2013.  The evaluations included information about Nelson's background reported by Nelson himself, including that during his service in the Air Force he was sent to learn Arabic and Mandarin at the Defense Language Institute.  During his service he was incarcerated for six months for a conspiracy to commit murder charge unrelated to this case.[1]  Nelson claimed that, during this incarceration, he suffered physical and sexual abuse that he did not initially report to anyone.  As a result of the abuse, beginning in 2002, he suffered from PTSD, including experiencing nervousness, nightmares, flashbacks, and panic attacks.

However, Nelson did not seek any treatment for his PTSD symptoms because he was concerned about maintaining his military security clearance.  Instead, according to Nelson, he was formally diagnosed with PTSD in 2010 when he underwent a Veterans Affairs ("VA") disability screening.  During that

---

[1]The record indicates that Nelson eventually was exonerated of the conspiracy to commit murder charge but does not explain whether Nelson was acquitted or the charge was otherwise dropped.

screening, Nelson told the evaluator about his recurring nightmares and panic attacks but not the sexual assault.

Nelson's competency and criminal responsibility reports also included a section on the findings of Dr. Tin Chin, a contract psychiatrist at MCC, who conducted a routine psychiatric evaluation of Nelson. During the evaluation, Nelson reported that he was honorably discharged from the Air Force in 2010. Nelson identified the bank robbery as the cause of his arrest but stated he could only "vaguely recall what occurred or the reasons for his actions." He also reported the 2002 sexual abuse, as well as the flashbacks and insomnia that resulted from the abuse. Dr. Chin concluded that Nelson may have suffered an episode of impulsive behavior followed by a period of dysphoric mood. Based on Nelson's self-reported symptoms, Dr. Chin diagnosed him with bipolar disorder and prescribed risperidone, an antipsychotic medication.

Dr. Schlessinger's competency and criminal responsibility reports further noted that Nelson's performance on psychological tests indicated "possible exaggeration of symptoms and a cry for help." Based on the psychological tests, the reports indicated Nelson's intellectual abilities to be above average. In the reports, Dr. Schlessinger diagnosed Nelson with PTSD based on his reported symptoms from his sexual assault. She also diagnosed him with personality disorder and schizoid and narcissistic personality traits.

5

In support of the schizoid and narcissistic personality traits diagnosis, the competency and criminal responsibility reports noted Nelson's preference to spend time alone, overestimation of his abilities and inflation of his accomplishments, "pervasive pattern of grandiosity," sense of self importance, and lack of empathy. The reports noted that he "embellished his job skills," and presented himself as "haughty" and "all-knowing" during the interviews.

Ultimately, Dr. Schlessinger concluded that Nelson was both competent to stand trial and sane at the time of his offenses.[2] As to competency, Dr. Schlessinger noted that, despite Nelson's PTSD, he possessed an understanding of the criminal proceedings, the capacity to assist counsel in his defense, and could rationally make decisions regarding legal strategy.

As to criminal responsibility, Dr. Schlessinger concluded that, at the time of the offenses, Nelson's PTSD did not impair his ability to appreciate the wrongfulness of his conduct. The report acknowledged Nelson's claim that his memory of the crime consisted only of "disjointed 'still frame pictures' of the incident." Leading up to the robbery offense he recalled feeling depressed, missing his children, having a panic attack, and buying a larger gun in case he decided to commit suicide. He described the details of his robbery offense as a "mystery" and recalled being arrested in the woods and waking up in jail.

---

[2]Following Dr. Schlessinger's reports, the parties stipulated to Nelson's competency to stand trial.

Dr. Schlessinger reasoned, however, that the statements and reports of the investigating officers regarding the robbery revealed that Nelson's conduct on the day was not "erratic, bizarre, or unusual." For example, the bleach on Nelson's items that were recovered near the scene of the robbery suggested that he planned ahead and anticipated using the bleach to clean items if given a dye pack at the bank. His other conduct showed "clear intent, strategic thinking, . . . premeditation, . . . [and] prudence and effort in minimizing the risk of detection," including purchasing and loading a gun, disguising his identity, and instructing the bank tellers not to insert dye packs. Thus, although Nelson suffered from PTSD, he was rational at the time of the robbery offense, understood his conduct, and was able to appreciate the wrongfulness of his conduct.

## D.    Pre-Trial § 3006A(e) Motion for Appointment of Mental Health Experts, a Private Investigator, and Additional Legal Counsel

In July 2013, following the submission of Dr. Schlessinger's reports, Nelson moved pursuant to 18 U.S.C. § 3006A(e) for appointment of independent psychiatric or psychological experts, as well as a private investigator and additional legal counsel, to assist in the development and presentation of an insanity defense. In the motion, Nelson's counsel asserted that based upon the totality of the criminal responsibility report, including the PTSD diagnosis by Dr. Schlessinger and the bipolar disorder diagnosis by Dr. Chin, Nelson had a basis for raising an insanity defense. Nelson's counsel also opined that Nelson's behavior

7

on the day of the robbery was "bizarre[] based upon his character and past," given that he had a clean criminal record and was formerly employed as a contractor for the National Security Agency ("NSA"), "extremely intelligent," and fluent in Arabic and Mandarin.

The § 3006A(e) motion was also based, in part, upon claims by some of Nelson's family members that he possibly suffered from multiple personality disorder. In support of the request for a private investigator, Nelson's counsel stated that Nelson's ex-wife potentially had information concerning his mental health but was not being cooperative, and thus assistance was needed to obtain information from her. The § 3006A(e) motion requested the assistance of additional counsel due to the complexity of the insanity defense. Finally, the motion also noted that Nelson was receiving VA benefits following the determination that he was "50% disabled based upon his mental condition."

### E.    Pre-Trial § 3006A(e) Hearing

On July 30, 2013, the district court held a hearing on Nelson's § 3006A(e) motion, at which "the issues of Nelson's sanity and competency were explored."

Responding to questions from both his counsel and the district court, Nelson testified that, during his time in the Air Force, he studied languages at the military language school in Monterey, California, and served as a cryptologic linguist. He studied both Chinese and Arabic and received an associate's degree in Arabic.

Nelson also testified that he was sexually assaulted while in the Air Force but never reported the assault for fear of jeopardizing his security clearance. During his "out-processing" from the Air Force, he was diagnosed with PTSD after suffering depression and thoughts of suicide. As a result, Nelson received $810 per month in VA disability benefits. Following his discharge from the Air Force, he worked as a contractor for the NSA.

Linda Nelson ("Linda"), Nelson's mother, testified that she believed her son suffered from manic depression. She had seen him experience depression in the past, including in middle school when he was almost institutionalized after cutting himself. Linda had also heard of Nelson using the identity "Jacob Kane" in public and online. Linda claimed that Nelson was highly intelligent and received bad grades in school only because he failed to apply himself.

The district court continued the July 30, 2013 hearing for further inquiry, stating that it wished to consider additional information and review Nelson's Air Force and VA records.

Three weeks later, on August 20, 2013, the district court issued a written notice setting the continued hearing for two days later, August 22, 2013.[3]

At the August 22, 2013 hearing, the district court indicated that, to rule on the necessity of appointing mental health experts, it needed to test Nelson's alleged

---

[3]There is no indication that Nelson or his counsel requested a continuance of the August 22 hearing.

"fluency" in foreign languages.[4]  The district court noted that Nelson's foreign language skills were not "determinative of anything," but indicated that it viewed Nelson's claimed fluency in Arabic and Mandarin as relevant to his credibility in alleging mental illness.

Accordingly, the district court called two foreign language experts, Walter Cheng and Christopher Pratt, to test Nelson's foreign language skills in Mandarin and Arabic, respectively.  Nelson's attorney did not object to the appointment or calling of these witnesses.  Prior to the language examinations, Nelson addressed the district court and represented that he could speak Mandarin only "conversational[ly]" but claimed that he had far more experience with—and could read and write—Arabic.  Nelson indicated that he had not used Mandarin since 2002 but had used Arabic more recently.

Court-appointed expert Cheng tested Nelson's verbal and reading abilities in Mandarin and found that Nelson spoke "very few" words, could not read basic questions, and did not have even a "kindergarten" level of proficiency in the language.  Nelson's attorney declined the opportunity to question Cheng about his qualifications as a linguist in English and Mandarin.  On cross-examination by Nelson's attorney, Cheng conceded that an individual would likely lose their

---

[4]On the day of the August 22, 2013 hearing, the district court entered a written order specifically ordering that Nelson be tested on his foreign language skills and appointing two language experts to that end.

ability to speak or understand Mandarin if that individual did not use the language for ten years.

Court-appointed expert Pratt tested Nelson's verbal and written skills in Arabic and found that Nelson scored a 2 out of 10 in verbal proficiency and a 7 out of 10 in written proficiency.  Nelson's attorney extensively cross-examined Pratt on his method of testing Nelson and whether the dialect of Arabic to which Nelson had been exposed would have any effect on his abilities.

## F.    District Court's Order Denying § 3006A(e) Motion

Following the hearing, the district court issued a detailed and comprehensive 34-page order denying Nelson's § 3006A(e) motion for the appointment of an independent mental health expert, investigator, and additional counsel.  The district court found that Nelson was not entitled to "investigative, expert, or other services" under § 3006A(e) because he had not shown that the expert services were necessary for adequate representation.  Specifically, Nelson had not demonstrated that he had a plausible insanity defense.

In support of its finding that Nelson's insanity defense was implausible, the district court reviewed four categories of evidence presented at, or submitted in connection with, the hearing on Nelson's § 3006A(e) motion.  First, the district court thoroughly described Dr. Schlessinger's reports, including her conclusion that Nelson was criminally responsible for his crimes.  The court found that Dr.

11

Schlessinger's evaluation of Nelson, including her observation that he had an inflated sense of self worth, "hit the nail on the head," and the court "fully adopted and endorsed" her reports.

Second, the district court extensively examined Nelson's VA records, which included medical records from an Army medical center at Fort Gordon, Georgia, where Nelson was seen multiple times during his time in the Air Force.[5] The court noted that, although the medical records dated back to July 2005, the first mention of any mental issue was not until October 2009.

Specifically, on October 26, 2009, Nelson presented to the medical center's psychology department with complaints of depression, anxiety, and sleep disturbances based on problems at work and home, including the pending divorce from his wife. Nelson also stated that his depression, anxiety, and nightmares resulted from the 2002 incident in which he was falsely accused and imprisoned. Nelson reported cynicism of the justice system and distrust of law enforcement following the incident, but he denied any sexual contact without his consent. Nelson was diagnosed with "Major Depression Single Episode Moderate."

On November 18, 2009, Nelson appeared for an appointment with the medical center's psychology department. He was diagnosed with "Adjustment

---

[5]The district court noted that Nelson was never deployed to combat during his military career.

Disorder with Depressed Mood" but was not prescribed any medication. Nelson's medical center records included no further entries from the psychology department.

Between June and October 2010, Nelson presented repeatedly to the Army medical center with back pain and was prescribed pain medications and anti-inflammatories. At multiple times during these visits Nelson denied having any symptoms of depression or sleep disturbances.

During this same time period, on August 16, 2010, Nelson appeared at the medical center as protocol for his involuntary separation from the Air Force. The medical report from that date states that Nelson was not claiming any disability benefits.

On October 27, 2010, Nelson came to the medical center both because of claimed back pain and to complete paperwork for his discharge from the Air Force. Nelson reported that he was not experiencing any depression and requested a waiver of his exit physical exam. A physician signed the necessary paperwork for Nelson to receive a waiver of the physical exam.

On November 8, 2010, however, Nelson filed a VA form claiming entitlement to benefits based on the following disabilities: "low back pain with radiculopathy," "adjustment disorder with depressed mood," "insomnia," and "anhedonia," all with a listed onset date of October 2010.[6]

_____

[6]Nelson subsequently withdrew his claim for disability based on back problems.

13

Because of the claimed adjustment disorder, the VA sent Nelson to an independent contractor, QTC Medical Services.  On June 3, 2011, Nelson reported to the QTC Medical Services examiner that he was stabbed during his 2002 incarceration.  As a result, he alleged suffering from "panic attacks more than once a week, impairment in short and long term memory (e.g. retention of only highly learned material, forgetting to complete tasks), . . . disturbances of motivation and mood[,] . . . [and] difficulty establishing and maintaining relationships because of irritability and anxiety."

Based on this single evaluation and "Nelson's self-reports," the examiner gave Nelson a 50 percent disability rating for "PTSD (claimed as adjustment disorder with depressed mood, insomnia and anhedonia)."  The examiner also noted that Nelson's reported symptoms during his November 2009 visit to the Army medical center, although diagnosed as adjustment disorder, were consistent with PTSD.  The VA records of Nelson's disability benefits also "indicate[d] that Nelson's PTSD diagnosis [was] non-sexual in nature."

In September 2012, less than six months before the bank robbery, Nelson received a lump-sum disability payment of $16,413, retroactive to the November 2, 2010 onset date of his PTSD.  Thereafter he received $810 per month for his disability.

14

Third, the district court considered Nelson's recent financial records. The district court noted that, after Nelson's discharge from the Air Force, he worked as an independent contractor at Fort Gordon, reportedly earning $62,500 per year. Although Nelson became unemployed in November 2012, his bank account records revealed that his usual financial habits—including spending large amounts of money on entertainment and clothing—"continued unabated." For example, in the month after he became unemployed, Nelson spent nearly $1,500 on clothing, made cash withdrawals totaling $3,000, purchased Cirque de Soleil tickets for more than $500, and spent hundreds of dollars on trips.

Based on Nelson's bank records, the district court found that in the months leading up to the bank robbery, contrary to defense counsel's claim that Nelson was "a depressed man suffering from PTSD," Nelson was "well-groomed, well fed, thoroughly entertained, and well-traveled." It further appeared that, by the time of the bank robbery, Nelson, "having burned through his disability money and his salary and relying solely upon the monthly disability check, . . . was at a cross-road between have and have not." The district court found that the expenditures were consistent with Dr. Schlessinger's conclusion that Nelson had a narcissistic personality.

Fourth, the district court reviewed the inconsistencies in Nelson's testimony and his VA records. In particular, the district court focused on the language

15

experts' assessment of Nelson's claimed fluency in Arabic and Mandarin, noting that Nelson had "failed, miserably," in communicating with the experts. The district court indicated that it had tested Nelson's purported foreign language abilities to gauge his credibility in light of Dr. Schlessinger's observations that "Nelson embellished his job skills and presented himself in a haughty, all-knowing way" and demonstrated "narcissistic personality."

Given Nelson's exaggerated claims of fluency in foreign languages, the district court concluded a "closer look" at his credibility was "in order," and it recounted several additional inconsistencies bearing on Nelson's credibility. For example, Nelson falsely reported to Dr. Schlessinger that he received outpatient treatment for his PTSD and that he had been honorably discharged from the Air Force when in fact he had been involuntarily separated following a demotion.

In light of the above-described evidence, the district court found that Nelson's insanity defense was implausible.[7] The district court recognized that Nelson had been diagnosed with PTSD but found that this did "not end the inquiry":

> [A] closer look at the circumstances behind the PTSD disability rating, which no doubt played into [Dr. Schlessinger's] determination, leaves a distaste for the process that only serves to lend incredulity to the diagnosis. It appears that Nelson's claim of disability was an

---

[7]The district court also found, independent of Nelson's stipulation to his competency to stand trial, that Nelson was competent to stand trial under 18 U.S.C. § 4241 based on Dr. Schlessinger's competency report.

afterthought—perhaps suggested by the out-processing clerk who filled out the VA [benefits] application for Nelson's signature.

The district court noted that Nelson received a 50 percent disability rating based upon one episode of depression and self-reports of nightmares and panic attacks.

In any event, the district court reasoned, "whatever the extent of Nelson's PTSD, it did not interfere with Nelson's ability to appreciate the wrongfulness of his conduct on the day of the robbery." Based on the criminal responsibility report and the district court's own "examination of the circumstances behind Nelson's PTSD diagnosis and of Nelson himself," the district court observed:

> Nelson has an inflated sense of self and from what I have observed, he is an opportunist and a highly manipulative one. This time, he saw an opportunity to exploit his PTSD diagnosis, his alleged loss of memory, and his idiosyncrasies to convince his counsel to claim that he is not criminally responsible for his actions. The Court, however, is not convinced. In short, the defense of mental disease or defect is implausible.

## G.    First Jury Trial

In December 2013, Nelson's case proceeded to trial. The jury was unable to reach a verdict, however, and the district court declared a mistrial. The district court reset the trial for February 2014.

## H.    District Court's § 3006A(f) Order

Following the district court's examination of Nelson's bank account records in connection with the § 3006A(e) insanity motion, the court determined that Nelson's earlier affidavit of indigency was "far from complete" and developed

17

"grave concerns about Nelson's potential for manipulation or abuse of Criminal Justice Act funds." Accordingly, in January 2014, the district court entered an order, pursuant to 18 U.S.C. § 3006A(f), directing $8,000 to be paid from Nelson's bank account to the clerk of the court.[8]

The district court noted that Nelson likely had received more than $27,000 from the VA over the past 18 months and presently had more than $8,000 in his bank account. At the time of the order, Nelson's legal expenses amounted to at least $12,227 for legal representation as well as expert witness fees and travel costs, and the district court found "no reason in the world why Nelson's own money ought not be tapped and used to pay his witnesses or the lawyer."

Nelson moved to reconsider the order, arguing his child support obligations should take priority over the CJA payments. The reconsideration motion noted that Nelson's wife testified at his first trial and that "withholding child support could create a hostile witness environment." Attached to the motion were Nelson's divorce decree and child support documentation, showing that he was obligated to pay his ex-wife $2,000 per month in child support. The district court denied Nelson's motion for reconsideration.

---

[8]Section 3006A(f) provides that if a district court finds funds are available from or on behalf of a person furnished CJA representation, it may direct the funds be paid to the appointed attorney or to the court to reimburse it for paying the attorney. 18 U.S.C. § 3006A(f).

## I.    Second Jury Trial

In February 2014, Nelson was retried.  At that trial, the government introduced evidence of the offense conduct as described above.[9]

After the government rested its case, Nelson called four witnesses in support of his insanity defense.  In relevant part, Nelson's mother testified that, during childhood, Nelson had an attention deficit diagnosis, made few friends, dressed in black, and attempted at least once to cut himself at school.

Nelson's mother also testified that, since Nelson left the Air Force, he had become progressively more depressed, used the name "Jacob Kane" as a false identity at times, and sometimes dressed in costume when he left the house.

Nelson himself took the stand and testified that he sometimes identified himself by the pseudonym Jacob Kane or assumed "Jacob Kane" as a persona. Nelson also testified concerning the 2002 sexual assault and his diagnosis of PTSD upon his discharge from the Air Force.

As to Nelson's mental state in the days leading up to the bank robbery, Nelson's mother testified that Nelson was having difficulty sleeping and was not himself.  Similarly, a former co-worker of Nelson's at Fort Gordon testified that, in the week prior to the bank robbery, Nelson seemed "down and anxious and upset."

---

[9]See discussion supra Part I.A.

19

Nelson testified that he did not remember any details of the bank robbery. He recalled purchasing a ski mask for jogging outside in the cold and buying the gun because he "had been going through a very difficult period" and had contemplated suicide. Nelson admitted that in the days preceding the bank robbery he spent a lot of money on restaurants, clothing, and entertainment, but described this heightened spending and social exposure as an attempt to make himself feel better during a time of heavy depression.

Dr. Chin testified that he diagnosed Nelson with bipolar or manic depressive disorder, prescribed Risperdal to treat the bipolar disorder, and determined that Nelson had trauma from the 2002 sexual assault. Dr. Chin opined that Nelson committed the bank robbery during a manic bipolar episode. Dr. Chin explained that bank robberies require high brain activity, a symptom consistent with a manic episode, and that manic episodes often involve the formulation of grandiose ideas and plans, like planning a bank robbery. Nelson's behaviors leading up to the robbery, including running errands and buying a new gun, were also consistent with a manic episode of bipolar disorder. Moreover, denying memory of criminal behavior is a common trait among bipolar individuals.

Upon questioning by the district court, Dr. Chin testified that he assessed Nelson at the MCC for only 45 minutes and that, in making his assessment, he relied solely upon Nelson's verbal statements and did not consult medical records.

20

On cross-examination, Dr. Chin conceded that bipolar disorder does not inherently mean an individual is unable to understand or appreciate his actions.

Following the testimony by Dr. Chin, who also testified at Nelson's first trial, the district court dismissed the jury to question Dr. Chin concerning apparent improprieties in the voucher he submitted requesting payment for his testimony in the first trial.  During this questioning, the district court also addressed Dr. Chin personally, stating:

> Dr. Chin, . . . I think you're a very nice, affable person. . . . I will tell you, though, very directly and personally that I think you're a very gullible physician to believe some of the stuff this fellow told you, and, you know, I believe anybody with a high school education and a little look at Wikipedia could talk you out of some pills and I don't think much of what you've told us and your unremitting adherence to this line of diagnosis in the face of facts to the contrary is bewildering.

After the defense rested, the government called Dr. Schlessinger as a rebuttal witness.  Dr. Schlessinger testified that the traits Dr. Chin relied upon in reaching a bipolar diagnosis were not consistent solely with bipolar disorder.  Nelson's purchase of a gun and mask, his selection of a familiar banking branch, and his possession of bleach suggested to Dr. Schlessinger that he planned his offense.  Such behavior seemed logical, clear, and not consistent with an erratic state.  Dr. Schlessinger, who conducted a total of nine hours of testing and evaluation, believed Nelson was exaggerating his symptoms on the psychological tests.

The jury found Nelson guilty on both counts of the indictment.

## J.    Motion for a New Trial

Nelson moved for a new trial on multiple grounds.  First, he argued that the district court erroneously denied his § 3006A(e) motion, as the requested expert and investigative services were necessary to fully develop his insanity defense.  Second, the district court improperly conducted a "pop quiz" on his language skills, thereby demonstrating bias and prejudice.  Third, relatedly, the district court's professed attitude toward Dr. Chin during trial suggested bias and prejudice.  Finally, the district court erred by seizing funds from his bank account to reimburse the court for CJA payments, thus depriving his children of child support.

Following a response by the government, the district court denied the motion for a new trial.

## K.    Sentencing

The presentence investigation report ("PSI") recommended a base offense level of 20 for the armed bank robbery count, pursuant to U.S.S.G. § 2B3.1.  The PSI added to that base offense level: (1) a two-level increase because the crime involved a financial institution, U.S.S.G. § 2B3.1(b)(1); and (2) a two-level increase for obstruction of justice, U.S.S.G. § 3C1.1.  As to the obstruction-of-justice enhancement, the PSI noted that Nelson's denial of any memory of the robbery and claim that he was not in control of his actions during the robbery were

22

against the preponderance of the evidence, and the jury's guilty verdicts indicated they discredited Nelson's testimony.

Based on a total offense level of 24 and a criminal history category of I, Nelson's guidelines range for the armed bank robbery count was 51 to 63 months' imprisonment. Count Two, the firearm count, carried a mandatory consecutive seven-year sentence under 18 U.S.C. § 924(c) and a corresponding seven-year guidelines range under U.S.S.G. § 2K2.4(b).

Prior to sentencing, Nelson objected to the PSI's failure to apply an acceptance-of-responsibility reduction, as well as the assessment of an obstruction-of-justice enhancement. Nelson argued that he never denied the operative facts of the robbery offense but merely presented evidence in support of his insanity defense, a defense founded upon the diagnoses by the Bureau of Prisons's own evaluators. Nelson also requested a downward departure for diminished mental capacity, pursuant to U.S.S.G. § 5K2.13, asserting that he committed the offenses under the influence of a reduced mental capacity due to his disorders.

At sentencing, Nelson reiterated his objections, and the district court overruled them. As to the obstruction-of-justice and acceptance-of-responsibility adjustments, the district court acknowledged that Nelson did not deny the physical facts of the robbery offense and that an insanity defense does not automatically preclude an acceptance-of-responsibility adjustment. In this case, however, Nelson

23

seemed so incredible that his testimony warranted the obstruction enhancement and precluded the acceptance reduction. The district court stated:

> It is my finding by clear and convincing evidence—certainly, more than a preponderance—that Mr. Nelson denied any memory of this event and that that was, indeed, a lie. It's not disingenuous. It is downright deliberately deceptive and it is the genesis of everything in this case that has related to his professed insanity defense. I simply don't believe him. I think the jury didn't believe him and beyond any reasonable doubt didn't believe him. . . . I will speak for the Court in saying that at least by a clear and convincing standard he has falsely denied his memory; consequently, his admission of criminal responsibility.

The district court also overruled Nelson's request for a downward departure based on diminished capacity, finding that, if anything, Nelson was very intelligent and attempted to fabricate an insanity defense.

The district court sentenced Nelson to a total sentence of 183 months' imprisonment, consisting of a high-end guidelines sentence of 63 months for the bank robbery conviction and a consecutive sentence of 120 months for the firearm conviction. The sentence on the firearm conviction resulted from an upward variance, which the district court imposed in light of the dangerousness of the offense and the fear instilled on the individuals in the bank.

Nelson timely appealed.

## II.  APPEAL OF § 3006A(f) ORDER

On appeal, defendant Nelson raises several issues concerning both his convictions and sentences. As an initial matter, before turning to these issues, we

24

dismiss Nelson's appeal in part to the extent that he appeals the district court's § 3006A(f) order directing CJA reimbursement.

Nelson argues that the district court erred in seizing his monthly VA benefits because the decision: (1) deprived him of favorable testimony by his ex-wife, as she was not receiving child support payments; and (2) "usurped certain powers of Congress," as multiple federal statutory schemes, such as the Bankruptcy Code, suggest that child support payments should take priority over other types of monetary obligations.

Section 3006A(f) provides that if a district court finds funds are available from or on behalf of a person furnished CJA representation, it may direct the funds be paid to the appointed attorney or to the court to reimburse it for paying the attorney.  18 U.S.C. § 3006A(f).

In United States v. Griggs, 240 F.3d 974 (11th Cir. 2001), this Court held that it lacked jurisdiction to review a district court's order directing a retained attorney to reimburse the CJA fund pursuant to § 3006A(f) for fees she received from a client, so that the fund could recover fees and expenses of the client's former court-appointed lawyer.  240 F.3d at 974.  This Court reasoned that "payment orders under § 3006A(f) are not made appealable by the CJA, are left to the discretion of the trial judge, are made in an administrative setting, are unrelated to the outcome of the case, and can be made without prior adversary hearings."

25

Id.; see also United States v. Homrighausen, 366 F. App'x 76, 78 n.3 (11th Cir. 2010) (unpublished) ("Under Griggs, we lack jurisdiction to review the merits of a district court's § 3006A(f) ruling[—]i.e., the finding that funds are available for payment and the discretionary decision whether to direct that funds be paid to the Treasury as reimbursement for court-appointed counsel[.]").

This Court does have jurisdiction, however, to review whether a district court "complied with the procedural requirements [of § 3006A] before entering the § 3006A(f) ruling." Id. (citing United States v. Bursey, 515 F.2d 1228, 1236 (5th Cir. 1975)). Specifically, the district court is prohibited from summarily disbursing funds to the Treasury under § 3006A(f) and instead must first "make an 'appropriate inquiry' as to the availability of the funds for payment as required under subsection (f)." Bursey, 515 F.2d at 1238 (quoting § 3006A(b)).

Here, Nelson does not contend that the district court failed to comply with the procedures in § 3006A(f) and Bursey before directing payment to the Treasury. Instead, Nelson's argument on appeal goes to the merits of the district court's decision that Nelson's bank account funds—which he believes should have gone to child support payments—were in fact available for payment to the Treasury and should be paid to the Treasury as reimbursement for court-appointed counsel.

26

Thus, pursuant to <u>Griggs</u>, we lack jurisdiction to review the district court's § 3006A(f) order and we dismiss Nelson's appeal in part to the extent that he appeals that order.

We now address Nelson's convictions claims before turning to his sentencing claims.

### III.  DENIAL OF § 3006A(e) MOTION

Defendant Nelson argues that the district court abused its discretion under 18 U.S.C. § 3006A(e) in denying his motion for the appointment of additional, independent mental health experts, a private investigator, and additional legal counsel.[10]

Section 3006A(e) provides that a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request said assistance from the court.  18 U.S.C. § 3006A(e)(1).  Upon a finding by the court that the services are necessary and the person is financially unable to secure them, the court may authorize the services and payment thereof.  <u>See</u> <u>id.</u>

To demonstrate a need for expert services, a defendant must establish that he (1) cannot afford the services, and (2) the services are necessary for an adequate defense.  <u>United States v. Rinchack</u>, 820 F.2d 1557, 1563 (11th Cir. 1987).  In

---

[10]We review the district court's denial of a motion for expert services under 18 U.S.C. § 3006A(e) for an abuse of discretion.  <u>United States v. Feliciano</u>, 761 F.3d 1202, 1208 (11th Cir. 2014).

determining the necessity of requested assistance, a district court may consider prior expert assistance, including the results of prior competency determinations, or other available evidence.  See id. at 1564.  The court may reject expert assistance as not necessary if it concludes that the defendant does not have a plausible claim or defense.  Id.

In Rinchack, this Court held that the district court properly denied a request for appointment of a psychiatric expert because the defendant failed to show necessity.  Id. at 1563-65.  This Court found that nothing in the record suggested the expert evaluations already done in the case were flawed.  This Court pointed out that although there was an expert report favorable to the defendant's incompetency claim, the district court reasonably could have found more persuasive a prior report finding the defendant competent.  Id. at 1564-65 (reasoning that the report finding competency was more persuasive because "[n]ot only was the report developed over a three month period of time, as compared to [the] single office visit [conducted before the report that was more favorable to the defendant's competency claim], . . . it reflected the opinions of several psychiatrists and neurologists").  Finally, this Court held that the district court could have determined the defendant already had sufficient evidence to present his competency claim.  Id. at 1565.

28

In addition, we will reverse a district court's ruling on expert services only if the district court's denial of services caused the defendant prejudice. See United States v. Feliciano, 761 F.3d 1202, 1208-09 (11th Cir. 2014). A defendant cannot properly demonstrate prejudice solely on the basis that the denial of expert services prevented him from having expert evidence in the form he believed to be most persuasive. Id. at 1209. In Feliciano, this Court held that where an expert testified to the medical condition Feliciano sought extra expert assistance on, the district court's denial of extra assistance to give more in-depth testimony on the medical condition did not constitute an abuse of discretion. Id.

Based on the record before us, we cannot say that the district court abused its discretion in denying defendant Nelson's § 3006A(e) motion for additional, independent mental health experts, a private investigator, and additional counsel to assist in the development and presentation of his insanity defense. The record amply supports the district court's finding that Nelson did not have a plausible insanity defense. See Rinchack, 820 F.2d at 1564.

In examining the plausibility of Nelson's insanity defense, the district court properly considered the prior expert reports already prepared by the MCC's forensic psychologist Dr. Kari Schlessinger and psychiatrist Dr. Tin Chin. See id.

The district court then reasonably could have found that the conclusions of Dr. Schlessinger, who evaluated Nelson through nine hours of interviewing and

29

testing and found that he was sane at the time of his offenses, were more persuasive than the bipolar diagnosis and conclusions of Dr. Chin.  Dr. Chin tested Nelson on only one occasion for 45 minutes and admitted that bipolar disorder did not inherently mean a person cannot understand or appreciate his actions.  The district court also took into account Nelson's own testimony, finding that he was not credible, and extensively reviewed Nelson's medical and disability records.

We are unpersuaded by Nelson's argument on appeal that if the district court found that Dr. Chin did not have sufficient time to properly diagnose and treat Nelson, this reason "alone would warrant the appointment of another psychiatrist." Regardless of the reliability of Dr. Chin's report, Dr. Schlessinger's findings, Nelson's VA records, and Nelson's own testimony provided an adequate basis for the district court's finding that Nelson did not have a plausible insanity defense.

In addition, at trial, Dr. Chin testified as to his findings from his psychiatric evaluation of Nelson, including the possibility that Nelson suffered from a psychiatric episode during the commission of the offense.  Although the testimony may not have been as comprehensive as Nelson desired, he still benefited from an expert's favorable assistance.  For this same reason, Nelson has also failed to show prejudice.  See Feliciano, 761 F.3d at 1209.  Given the discretion afforded the fact-finder, the district court did not commit reversible error in denying Nelson's § 3006A(e) motion.

## IV.  ALLEGED DUE PROCESS VIOLATIONS

Defendant Nelson also contends that the district court violated his due process rights by (1) denying his § 3006A(e) motion for the appointment of additional, independent mental health experts, a private investigator, and additional legal counsel, thereby depriving him of a fair trial; and (2) failing to adequately notify him of the nature of the continued hearing on the § 3006A(e) motion that was ultimately used to quiz him on his language skills.[11]

### A.    Denial of § 3006A(e) Motion and Due Process

Supreme Court precedent establishes that the due process clause of the Fourteenth Amendment requires that the government, upon request, provide indigent defendants with the "basic tools of an adequate defense . . . when those tools are available for a price to other prisoners." Moore v. Kemp, 809 F.2d 702, 709 (11th Cir. 1987) (en banc) (quotation omitted).  However, the government "need not provide indigent defendants all the assistance their wealthier counterparts might buy; rather, fundamental fairness requires that the [government] not deny them an adequate opportunity to present their claims fairly within the adversary system." Id. (quotation omitted).  A defendant must show a reasonable probability that an expert would assist his defense and that the denial thereof would

---

[11]We review a constitutional due process claim de novo. See United States v. Hill, 643 F.3d 807, 874 (11th Cir. 2011).  Generally, we review for an abuse of discretion the district court's decisions in conducting pretrial proceedings. See, e.g., United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011).

31

result in a fundamentally unfair trial. Id. at 712. In relation to an insanity defense, the showing of necessity must demonstrate a substantial basis for the defense. Id.

Here, the district court's denial of Nelson's § 3006A(e) motion did not violate his Fourteenth Amendment due process right to a fair trial. For the same reasons discussed above that Nelson did not show that he had a plausible insanity defense, Nelson failed to demonstrate a reasonable probability that additional expert assistance would aid him in an insanity defense or that he had a substantial basis for the defense. See id.

## B.    Notice of Continued Hearing on § 3006A(e) Motion

We review a due process claim not properly raised in the district court for plain error.[12] United States v. Hayes, 40 F.3d 362, 364 (11th Cir. 1994). Plain error exists when: (1) there was an error, (2) that was plain, (3) that seriously affected a defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. United States v. Acevedo, 285 F.3d 1010, 1012 (11th Cir. 2002).

Generally, a district court's decision to hold a hearing on pretrial matters lies within the court's sound discretion. See United States v. Gamory, 635 F.3d 480,

---

[12]Although Nelson argued in his motion for new trial that the district court erred in conducting a "pop quiz" on his language skills, there is no indication in the record that Nelson's attorney requested a continuance of the August 22 hearing or contemporaneously objected to the district court's appointment of the language experts.

32

490 (11th Cir. 2011); Cheely v. United States, 367 F.2d 547, 548-49 (5th Cir.

1966).  As our predecessor Court explained,

> [w]hile a trial judge . . . has a duty to conduct the trial carefully, patiently, and impartially, the judge has wide discretion in managing the proceedings . . . .  He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion.

United States v. Hawkins, 661 F.2d 436, 450 (5th Cir. Unit B Nov. 1981)

(quotation omitted).[13]  A defendant is denied a constitutionally fair trial by the

district court's management of the proceedings "[o]nly when the judge's conduct

strays from neutrality."  Id. (quotation omitted).

We conclude that the district court neither abused its discretion nor

committed plain error (1) by giving only two days' notice that the hearing on

Nelson's § 3006A(e) motion would be continued from July 30, 2013, to August 22,

2013, and (2) by not giving specific notice that the court was going to have

language experts at the August 22 hearing.  Nelson does not point to a specific rule

requiring the district court to provide notice of the hearing or information about the

nature of the hearing.  Nor has Nelson identified any precedent showing that the

district court "stray[ed] from neutrality," or otherwise violated due process, in

giving abbreviated notice.  See id.

---

[13]All Fifth Circuit Unit B decisions rendered after October 1, 1981, operate as binding precedent in the Eleventh Circuit.  United States v. Maxwell, 579 F.3d 1282, 1305 n.6 (11th Cir. 2009).

33

As to Nelson's testimony, Nelson and his mother already had testified at the July 30 hearing.  Thus, Nelson's ability to present his own testimony and that of his mother in support of his § 3006A(e) insanity motion was not affected by the district court's abbreviated notice of the subsequent August 22 hearing.

As to the language experts, the district court reasonably exercised its broad discretion over pre-trial proceedings to provide short notice of the August 22 § 3006A(e) hearing, and to withhold the particular details of the hearing—that there would be a language quiz—until the day of the hearing.  See id.  As the district court indicated, it used the language experts as a way to assess Nelson's credibility as to his claimed language skills in light of Dr. Schlessinger's report that Nelson "embellished" details and exhibited a narcissistic personality.  Advance detailed notice of the hearing could have defeated the purpose of the hearing—to spontaneously assess Nelson's language skills—by giving Nelson some opportunity to prepare his language skills or an explanation for his lack of skills.

Nelson also has not shown how earlier or more detailed notice would have changed the outcome of the hearing.  Nelson contends that the abbreviated notice prevented him from challenging the training or expertise of the language experts selected by the district court.  However, Nelson was given the opportunity to cross-examine the language experts and specifically to question them concerning their

credentials.  And even today Nelson has not proffered anything to call into doubt the experts' assessments of his foreign language abilities.  In any event, the language assessments formed just one of several grounds on which the district court based its finding that Nelson's insanity defense was implausible.  Thus, Nelson has not demonstrated that he suffered harm.

## V.  NELSON'S REMAINING CONVICTIONS CLAIMS

On appeal, defendant Nelson raises additional arguments in support of his overall claim that he received an unfair trial, which we dispose of summarily.

Nelson first asserts that the district court's comment about Dr. Chin's "gullib[ility]" and suggestion that he was improperly awarded VA disability benefits demonstrated the court's bias and failure to give him a fair trial.

We are unconvinced.  The allegedly biased comments by the district court to Dr. Chin and regarding the propriety of Nelson's disability benefits were made outside the jury's presence.  We will not reverse a conviction "based upon comments of the trial judge unless the comments are so prejudicial as to amount to denial of a fair trial," United States v. Ramos, 933 F.2d 968, 973 (11th Cir. 1991), and the defendant shows that the comments had "a clear effect on the jury," United States v. Morales, 868 F.2d 1562, 1576 (11th Cir. 1989) (quotation omitted and alteration adopted).  Nelson has not identified any way that these comments reached the jury or influenced the jury's decision-making process.

Nor do we find persuasive Nelson's argument that the district court's isolated comments show that it generally failed to provide him a fair trial.

Relatedly, Nelson argues that the district court abused its discretion in denying his motion for a new trial because of various instances of unfairness at trial, including the denial of expert assistance, the language quiz, and the district court's comments about Dr. Chin and his VA benefits.

We conclude that Nelson has not demonstrated that these alleged instances, taken as a whole, amounted to proceedings so fundamentally unfair as to warrant a new trial. See United States v. Sweat, 555 F.3d 1364, 1367 (11th Cir. 2009); United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005). Accordingly, the district court did not abuse its discretion in denying Nelson's motion for a new trial.

## VI.  SENTENCING ISSUES

On appeal, defendant Nelson raises three related issues concerning his sentence for armed bank robbery. First, he argues that the district court erred in enhancing his sentence based on obstruction of justice because he never contested the underlying facts of the robbery offense and had a reasonable basis for raising an insanity defense. Second, for these same reasons, the district court erred in not granting him an offense-level reduction for acceptance of responsibility. Finally, the district court erred by denying him a downward departure for diminished

capacity pursuant to U.S.S.G. § 5K2.13 because, according to both Dr. Schlessinger's and Dr. Chin's reports, he suffered from mental illness.[14]

Section 3C1.1 of the Sentencing Guidelines provides for a two-level increase to the offense level when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1.  The Application Notes to § 3C1.1 list examples of conduct warranting the enhancement, including "committing, suborning, or attempting to suborn perjury."  Id. § 3C1.1, comment. (n.4(B)).

When the district court assesses the obstruction-of-justice enhancement based on the defendant's perjury, it "should make specific findings as to each alleged instance of obstruction by identifying the materially false statements individually."  United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (quotation omitted and alteration adopted).  The testimony must have been: (1) under oath; (2) false; (3) material; and (4) "given with the willful intent to provide false testimony."  Id. at 763 n.4.  For purposes of § 3C1.1, "material . . . means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1, comment.

---

[14]We review findings of fact related to sentence calculation for clear error and review the application of the Sentencing Guidelines to the facts de novo.  United States v. Williams, 527 F.3d 1235, 1247-48 (11th Cir. 2008).  We also review for clear error the district court's determination regarding a reduction for acceptance of responsibility.  United States v. Moriarty, 429 F.3d 1012, 1022-23 (11th Cir. 2005).

37

(n.6).  We may also affirm an obstruction-of-justice enhancement if the record clearly reflects the basis for the enhancement.  See United States v. Uscinski, 369 F.3d 1243, 1246 (11th Cir. 2004).

Pursuant to U.S.S.G § 3E1.1(a), a defendant is entitled to a two-level reduction in his offense level if he clearly demonstrates acceptance of responsibility.  The commentary to § 3E1.1 states that:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) . . . . However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]

U.S.S.G. § 3E1.1, comment. (n.1(A)).  The reduction for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  Id., comment. (n.2).

However, a defendant who is convicted at trial is not automatically precluded from a reduction.  Id.  "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial."  Id.  This may occur when a

38

defendant goes to trial "to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct." Id. Finally, this Court has held that an acceptance-of-responsibility enhancement is not warranted when a defendant receives an enhancement for an obstruction of justice. See United States v. Arguedas, 86 F.3d 1054, 1059-60 (11th Cir. 1996).

Section 5K2.13 of the Guidelines provides for a downward departure if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." However, the district court may not depart downward if "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." U.S.S.G. § 5K2.13. This Court has held that if a defendant committed a violent crime, the defendant is not eligible for a § 5K2.13 diminished-capacity departure. See United States v. Salemi, 26 F.3d 1084, 1087 (11th Cir. 1994).

All of Nelson's sentencing arguments are without merit. First, the district court did not clearly err by applying an obstruction-of-justice enhancement. Although Nelson did not contest the elements of the underlying bank robbery, the record shows that the district court's finding that Nelson deliberately lied in his testimony was not clearly erroneous. In particular, the district court found that

39

Nelson's claimed lack of memory of the offenses to be "downright deliberately deceptive" and a "lie." We defer to the district court's credibility finding, see Singh, 291 F.3d at 763-64, and this finding was supported by the record, in particular the evidence that Nelson deliberately planned the crime and was malingering during his mental health evaluations.

Second, the district court did not clearly err by declining the reduction for acceptance of responsibility. Although a defendant does not automatically forgo the acceptance reduction by going to trial, here Nelson did forgo the reduction by actively, and falsely, denying memory of the offense conduct. See U.S.S.G. § 3E1.1, comment. (n.2). Moreover, given that Nelson's conduct properly resulted in an obstruction-of-justice enhancement, as discussed above, a reduction for acceptance of responsibility was not warranted. See Arguedas, 86 F.3d at 1059-60.

Finally, the district court properly declined Nelson's request for a downward departure under § 5K2.13. The language of § 5K2.13 and our precedent clearly indicate that a diminished-capacity departure is not available if a defendant commits a violent crime or poses a serious risk of violence. See U.S.S.G. § 5K2.13; Salemi, 26 F.3d at 1087. Nelson committed a violent crime when he robbed a bank at gunpoint.

40

## VII.  CONCLUSION

For the foregoing reasons, we affirm defendant Nelson's convictions and total sentence of 183 months' imprisonment, and we dismiss Nelson's appeal in part to the extent that he appeals the district court's § 3006A(f) order.

**AFFIRMED IN PART AND DISMISSED IN PART.**