[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15341
_____

D.C. Docket No. 8:11-cr-00249-EAK-TBM-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO FELICIANO,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 3, 2014)

Before PRYOR and MARTIN, Circuit Judges, and GOLD,[*] District Judge.

MARTIN, Circuit Judge:

_____

[*] Honorable Alan Stephen Gold, United States District Judge for the Southern District of Florida, sitting by designation.

Francisco Feliciano was indicted in federal court for both an attempted bank robbery on April 1, 2011 as well as a more successful bank robbery ten days later in which over $10,000 was taken from the bank.  Mr. Feliciano was also charged with using a firearm during each of those robberies and for being a felon in possession.[1]  The jury convicted Mr. Feliciano on all five Counts.  The District Court sentenced him to 110 months for both bank robberies and for being a felon in possession; a consecutive term of 84 months on the gun charge associated with the attempted bank robbery; and another consecutive term of 300 months for the gun charge associated with the successful bank robbery.  Mr. Feliciano asks this Court to vacate all of his convictions associated with the bank robberies, but concedes there was sufficient evidence to sustain his conviction for being a felon in possession.  We agree with Mr. Feliciano that the jury's verdict on the gun charge associated with the second bank robbery cannot stand and vacate that conviction. We affirm his convictions on the remaining Counts.

## I.

We first address Mr. Feliciano's challenge to the sufficiency of the evidence supporting his convictions.  Central to the government's case was the testimony of

---

[1] Specifically, the charges against Feliciano were :  (Count One) attempted bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d) and 2; (Count Two) use of a firearm during the attempted bank robbery in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; (Count Three) bank robbery in violation of 18 U.S.C. §§ 2113(a) and 2; (Count Four) use of a firearm during the bank robbery in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (Count Five) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

the two people who were alleged to have participated in the April 1st and/or 11th incidents with Feliciano: Steven Trubey and Christopher Quinn. Investigators recovered no fingerprints, DNA, or other physical evidence at the banks or in the getaway vehicle used on April 11th. The person the government alleged to be Mr. Feliciano at the two incidents was hard to identify from bank surveillance of the robberies, because the robber was wearing a mask, gloves, a hooded sweatshirt, and long pants. Therefore, Messrs. Trubey and Quinn, who detailed what they knew about the planning and execution of the April 1st and 11th incidents, including Mr. Feliciano's purported central role, were key.

According to Mr. Trubey, he and Mr. Feliciano planned the April 1st incident in part by going to the target, First Bank, before the intended robbery to decide how easy it would be to rob and to plan how they would get there and back. Mr. Trubey told the following account. On April 1st, they came to First Bank together in the afternoon, and Mr. Trubey went in to ask about opening a checking account for the purpose of casing the bank. After Mr. Trubey returned to the car, Mr. Feliciano—wearing his disguise—then entered the bank. Mr. Feliciano eventually left First Bank without taking any money because the tellers successfully hid from him. He then jumped in the car with Mr. Trubey. At that point Mr. Trubey noticed that Mr. Feliciano had a gun, which they sold to a pawn shop later that day. A few days later, Mr. Feliciano raised the idea with Mr.

3

Trubey to try to rob a different bank. Mr. Feliciano suggested adding a third person, Mr. Quinn.

According to Mr. Quinn's testimony, Mr. Feliciano first asked him to steal a car, but did not explain that it would serve as a getaway car for a robbery. Mr. Quinn gave the following account. It was only later in planning for the April 11th robbery that Mr. Feliciano asked Mr. Quinn to participate in robbing the second target, the San Antonio Citizens Federal Credit Union, and Mr. Quinn agreed. On April 10th Messrs. Feliciano and Trubey met to discuss plans for the Credit Union robbery, including that Mr. Quinn would carry a fake bomb in an effort to ensure compliance with their demands. The next morning the three men met at Mr. Feliciano's house and made the fake bomb for Mr. Quinn to hold. That afternoon they went together to the Credit Union, and Messrs. Feliciano and Quinn went in while Mr. Trubey waited in the car. Inside, Mr. Quinn saw Mr. Feliciano jump over the counter, get money from the tellers' cash drawers, and jump back. The two then left the bank and drove away with Mr. Trubey.

Mr. Feliciano challenges the sufficiency of the evidence, primarily attacking the credibility of Messrs. Trubey and Quinn. This Court reviews de novo a challenge to the sufficiency of the evidence. United States v. Brown, 665 F.3d 1239, 1248 (11th Cir. 2011). "We take the evidence in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict. A

4

conviction must be upheld unless a rational fact-finder could not have found the defendant guilty under any reasonable construction of the evidence." Id. (quotation marks and alterations omitted).

The jury has exclusive province over the credibility of witnesses, "and the court of appeals may not revisit this question" unless it is "incredible as a matter of law." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). "[F]or the testimony to be considered incredible, it must be unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985) (quotation marks and alterations omitted).

Although Messrs. Trubey and Quinn both admitted on the stand that they had at times not told the truth, their credibility was for the jury to determine. On appeal Mr. Feliciano points to several minor issues with their testimony, but those issues have far too little impact on the broader narrative that both men told: Mr. Feliciano's planning, preparation, and participation in both the April 1st and April 11th incidents. For example, Mr. Feliciano refers to an exchange during Mr. Trubey's testimony as "bizarre" because Mr. Trubey answered "no" when asked if he ever had a conversation with Mr. Feliciano about robbing a bank and then later explained that he had. The jury may have thought Mr. Trubey understood the

5

question at first to mean whether they had had such conversations in advance of those that led to the April 1st incident, or may have thought he was nervous, or may have thought he was lying. Whatever it thought, the jury heard the testimony and could make its own determination.

One part of Mr. Trubey's testimony was obviously wrong and Mr. Feliciano rightly takes issue with it. Even so, it seems easily explained and in any event was another issue of credibility for the jury. Mr. Trubey testified that on April 1st, between casing the bank and Mr. Feliciano's attempted robbery, the two men drove to a court hearing and back in 41 minutes—something that would have necessitated an average speed of approximately 200 miles per hour. One part of the explanation, of which the jury was aware, was that Mr. Trubey had some mental difficulties, and often had trouble remembering the order of events. More fundamentally, Mr. Trubey seems to have simply mixed up the day of when he took Mr. Feliciano to an appointment related to another of Mr. Feliciano's cases. Mr. Trubey testified it was April 1st, but others testified it was April 11th. Later Mr. Trubey, apparently realizing his mistake, said, "If I got the dates mixed up, I'm very sorry to the Court that I might have got the dates messed up." It was for the jury to determine the significance of this mistake, and it is not the province of this Court to disturb that decision.

Mr. Feliciano's other sufficiency argument is that there was a considerable discrepancy among eyewitness descriptions of the size of the masked man at the April 1st and 11th incidents, and a further discrepancy between those descriptions and Mr. Feliciano's actual size. It appears Mr. Feliciano was 255 pounds when arrested on April 21st.[2] Eyewitnesses described the masked man at the April 1st and 11th incidents variously as "over 200 pounds"; "heavier set"; "[k]ind of husky"; "a little stockier build, probably 230"; and "large." One outlier witness thought the masked man was "[m]aybe 180 pounds, 175 pounds." But these size estimates are not so inconsistent with Mr. Feliciano's build as to upset the jury's verdict on a sufficiency challenge. See Brown, 665 F.3d at 1248.

During the trial, counsel for Mr. Feliciano was able to demonstrate that both Messrs. Trubey and Quinn were not always truthful. Still, the jury chose to credit their testimony regarding Mr. Feliciano's role in the April 1st and 11th incidents. And while there were slight differences in the description of the size of the masked man at those incidents, they were mostly consistent with Mr. Feliciano's appearance. Therefore, Mr. Feliciano's sufficiency challenge to the jury's verdict fails.

## II.

---

[2] One page of Defendant's Exhibit 21C, a record from the Hillsborough County Sheriff's Office, stated Mr. Feliciano was 235 pounds. But that is contradicted by another record in 21C that stated he was 255 pounds. We use 255 because that is the number Mr. Feliciano uses.

We next address Mr. Feliciano's argument that he was improperly denied expert assistance that was crucial to his defense.  Central to Mr. Feliciano's defense was the argument that he could not have been the masked robber on April 11th because that man vaulted back and forth over a teller counter which Mr. Feliciano could not have done.  He claimed he had a long-term back injury that prevented him from such activity.

Before trial, counsel for Mr. Feliciano moved ex parte pursuant to 18 U.S.C. § 3006A(e)[3] for an order authorizing an MRI for his client, along with a physical examination and expert opinion.  The motion stated that counsel had "medical records . . . showing a history of treatment for significant back problems," including records from 2010 and 2011, but efforts to obtain an MRI Mr. Feliciano had in 2002 "have been unsuccessful."[4]  Counsel requested $1,100 pursuant to the Criminal Justice Act to pay for the MRI and an expert to read the MRI.  The magistrate judge denied the motion because "[t]here appears to be other less costly means of establishing medical impairment available to the Defendant."

---

[3] "Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.  Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services."  18 U.S.C. § 3006A(e)(1).

[4] It was determined later that Mr. Feliciano misremembered the date and the MRI was taken around 2000.  Counsel eventually located a report about the MRI and some related materials, but the MRI itself had been destroyed in keeping with the record retention policy of the facility where it was performed.

8

Mr. Feliciano moved for reconsideration of the magistrate judge's denial. The District Court found that Mr. Feliciano "has not included any explanation for the absence of . . . medical records" from 2002 to 2011,[5] and also that "an MRI taken in 2012 is not necessarily probative of the Defendant's physical impairment from herniated discs in 2011." The District Court concluded that Mr. Feliciano "has established that an expert would be of assistance to the defense, but not that the denial of expert assistance would result in a fundamentally unfair trial," and denied the motion without prejudice. Mr. Feliciano moved again for a review of the magistrate judge's denial, stating in part that the proposed expert could "distinguish any recent back injury from any old, chronic injury to discs or other conditions." He also offered to cover all the costs. The magistrate judge denied the motion, stating: "By my consideration, the fact of an old back injury is unlikely to be relevant to any defense to be asserted in this case. Even assuming that it is, there are other ways of the Defendant proving this condition as demonstrated by his motion." Mr. Feliciano appealed the magistrate judge's denial of his request, which the District Court again denied.

We review the denial of a motion for expert services under 18 U.S.C. § 3006A(e) for abuse of discretion. United States v. Rinchack, 820 F.2d 1557, 1563 (11th Cir. 1987). Here, Mr. Feliciano asked not only for expert assistance,

---

[5] The District Court statement regarding the absence of medical records for that time period appears to have been a mistake.

9

but also transportation and an escort from prison to a medical facility in order to receive the MRI.  Because we conclude that the District Court did not abuse its discretion in denying Mr. Feliciano this expert assistance, we need not decide whether it erred in denying transportation to seek those services.

The standard used to determine whether a District Court should provide an indigent defendant with help from an expert is set out in Moore v. Kemp, 809 F.2d 702 (11th Cir. 1987) (en banc).  Moore noted that an expert can provide "essential" help through such means as "conduct[ing] tests or examinations."  Id. at 709.  Although a District Court does not need to provide indigent defendants with "all the assistance their wealthier counterparts might buy," id., we stated in Moore that "a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial," id. at 712.  To successfully argue a violation on this ground, a defendant must demonstrate three elements:  (1) he made a timely request for assistance; (2) the request was improperly denied; and (3) "the denial rendered the defendant's trial fundamentally unfair."  Id. at 710.

By requesting assistance well in advance of trial Mr. Feliciano easily demonstrates element number one.  Our precedent in Moore and Conklin v. Schofield, 366 F.3d 1191 (11th Cir. 2004) supports a conclusion that he has satisfied element number two, as well.  In Moore we cautioned that granting all

10

requests for expert assistance could be onerous because it would require either "direct appointment or a grant of funds."  809 F.2d at 712 n.8.  But neither of those concerns is present here.  Mr. Feliciano was prepared to pay for the expert he wanted.  And in <u>Conklin</u> this Court held that when a District Court is aware that an expert is essential to a defendant's sole defense, that court acts unreasonably in denying the defendant the necessary funds.  366 F.3d at 1208.  Here Mr. Feliciano's physical condition was his sole defense to the April 11th robbery.  Mr. Feliciano's argument is stronger than the one we accepted in <u>Conklin</u>, insofar as he offered to pay the cost of his request.  We conclude that the District Court improperly denied Mr. Feliciano's request for expert assistance.

We must next determine, then, whether the District Court's denial of assistance resulted in a fundamentally unfair trial.  The facts of this case present a closer question than we have seen in our precedent, so it is hard to fathom why the District Court denied Mr. Feliciano's request to get an MRI he was willing to pay for.  Still, we cannot say that the denial rendered Mr. Feliciano's trial fundamentally unfair.

Although Mr. Feliciano makes a compelling case that the District Court needlessly stood in the way of his obtaining evidence for his expert, he does not carry his burden of demonstrating fundamental unfairness.  Mr. Feliciano told the District Court in his requests for expert assistance that he did have some medical

11

records covering a wide period of time.  And ultimately Mr. Feliciano did get what he wanted, albeit not in the exact form he wanted:  he was examined and tested by a doctor who then testified at trial that it was his opinion that Mr. Feliciano was not physically capable of jumping over the teller window.  In Rinchack, we found no error when the District Court determined that additional psychiatric services were not necessary, and stated that a defendant is entitled "to a certain level of expert assistance where appropriate."  820 F.2d at 1565.  Mr. Feliciano had expert assistance.  That it was not in the most persuasive form does not render the trial fundamentally unfair.  The result here is similar to Conklin, where elements one and two were met but we found that the denial of expert assistance did not have a "substantial and injurious effect or influence in determining the jury's verdict." 366 F.3d at 1209 (quotation marks omitted).

## III.

Mr. Feliciano next claims the District Court erred by allowing a portion of a phone call between him and his brother Elias Feliciano (Elias) to be played in the government's rebuttal case to impeach Elias.  Mr. Feliciano argues that the call was improper impeachment and that it was improperly used as substantive evidence, both in violation of Federal Rule of Evidence 613(b).  We generally review evidentiary rulings for abuse of discretion.  United States v. Utter, 97 F.3d 509, 513 (11th Cir. 1996).

12

Elias was called to testify during both the government's case in chief and the defense's case. He testified that he had not spoken to his brother on the phone while Mr. Feliciano was in jail. He also said Mr. Feliciano came over to his house—at the time he lived across the street—for a birthday party for their father on April 1st around 2:30 or 3:00 p.m. But in the April 21, 2011 recording played for the jury, Elias told his brother, then in jail, about a conversation he had with a detective. Elias said to Mr. Feliciano:

> And he asked me on April 1 where was your brother, and I said that was the day of the birthday party and you was at the birthday party. He said what time was that? We started about 6 o'clock in the evening. He was like, where was he before that? You know, like you always do; you were sleeping. I said my brother's up all night, and he—I normally see him coming home when I'm sending my son to the bus.

At trial, the District Court allowed the recording of Elias to be played during the government's rebuttal case without Elias being recalled to the stand. Mr. Feliciano unsuccessfully objected "to the entire process because Elias was on the stand. And if this is a prior inconsistent statement, he should have had his attention drawn to that statement." The District Court told Mr. Feliciano he could put on "an unusual defendant's surrebuttal," but that the surrebuttal could include "[n]o other witnesses, no other comments." Mr. Feliciano did not object to that ruling, or specifically ask for Elias to be recalled to the stand. Therefore any argument of error in Elias not being allowed to be recalled to the stand is waived. See

13

Wilmington Trust Co. v. Mfrs. Life Ins. Co., 749 F.2d 694, 699 (11th Cir. 1985) (finding the failure to request the impeached witness to testify in surrebuttal a waiver of the issue).

The District Court committed no error in allowing the recording to be played after Elias was on the stand. Rule 613(b) states: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Although Mr. Feliciano objected to the timing of the introduction of the call, our precedent allows Elias's recorded statement to be introduced after he testified. Wilmington Trust Co. clarifies that Rule 613(b) provides "no specification of any particular time or sequence for this foundation requirement." 749 F.2d at 699. Elias was asked about whether he ever spoke on the phone with his brother—not just about the April 1st party but on any topic—and he denied it. The government therefore could use the phone call to impeach him with respect to that issue.

Mr. Feliciano also argues that the District Court erred in allowing the phone call to be used as substantive evidence, suggesting there should have been a limiting instruction given to the jury. Ordinarily a prior inconsistent statement is admissible only for the purpose of impeachment and not as substantive evidence. See, e.g., United States v. Livingston, 816 F.2d 184, 191–92 (5th Cir. 1987)

14

(instructing jury was proper at close of evidence to consider prior inconsistent statement only for impeachment).  Mr. Feliciano did not request a limiting instruction at trial or object to any purported uses of the call as substantive evidence.  He raises the issue for the first time on appeal, so we review it for plain error.  United States v. Knowles, 66 F.3d 1146, 1157 (11th Cir. 1995).  "Plain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused."  United States v. Billue, 994 F.2d 1562, 1567 (11th Cir. 1993) (quotation marks omitted).

We conclude that Mr. Feliciano failed to meet his burden in demonstrating that the District Court committed plain error when it allowed introduction of the phone call as substantive evidence.  Mr. Feliciano argues that the call "was used to prove the factual assertions that the father's April 1st birthday party started at 6:00 [p.m.] and that Francisco Feliciano did not arrive until that time."  But Elias said that Mr. Feliciano was at his home asleep, which is actually exculpatory.  It is therefore difficult to credit this as substantive evidence against Mr. Feliciano.  In addition, Elias was not the only one to testify that the party started at 6:00 p.m. but that certain guests came over earlier to help set up.  Although it may be best for District Courts to routinely issue an instruction limiting the use of a prior inconsistent statement admitted under Rule 613(b) to impeachment, the District

15

Court's failure to do so here did not constitute plain error that affected Mr. Feliciano's substantial rights.  See Billue, 994 F.2d at 1567.

## IV.

We now examine Mr. Feliciano's argument that the errors he alleges, when viewed together, resulted in an unfair trail.  "We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellant[] received a fair trial as is [his] due under our Constitution."  United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983).  In addition to the issues discussed above, Mr. Feliciano argues two additional problems plagued his trial.

Mr. Feliciano's first additional issue for his cumulative error claim is misstatements by the government in closing arguments.  Prosecutorial misconduct during closing arguments is established when improper remarks "prejudicially affect the substantial rights of the defendant."  United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009).  This Court looks to four factors in deciding whether prosecutorial misconduct has occurred:  "(1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused."  Id.

16

Mr. Feliciano's arguments about "significant misstatements of evidence" during closing arguments fail to persuade.  He argues that the government's claim that eyewitnesses generally agreed and provided descriptions of the masked man consistent with that of Mr. Feliciano "is not supported by the eyewitness testimony."  We have already considered this argument and rejected it above in section I.

Mr. Feliciano also criticizes the closing arguments because of the government's references to the testimony given about his medical condition.  For example, the government dismissed the testimony because there was no recent MRI, which is exactly what Mr. Feliciano had asked the District Court to permit him to have.  The government argued that the doctor who testified for Mr. Feliciano "saw no MRIs more current than 11 years ago, 2000.  He saw no x-rays whatsoever, no films of recent vintage. . . . If the opinion or information is old or incomplete, the opinion is going to be unreliable."  During oral argument before this Court counsel for Mr. Feliciano acknowledged that he did not think it was unfair for the government to make that comment because the "die had been cast" already by the judge's decision to allow counsel to attack on these points during cross-examination.  We have already concluded that the denial of expert services did not result in a fundamentally unfair trial.  Consistent with that conclusion, we cannot say that this statement during closing prejudiced Mr. Feliciano's substantial

17

rights.  At the same time we are troubled by what the government did here.  The government knew before it made its closing argument that Mr. Feliciano had requested expert assistance in receiving a recent MRI.  The government was also aware that the court had denied Mr. Feliciano's private request for a new MRI, but still attacked him before the jury for not having one.  This conduct does not meet the standard we expect of United States prosecutors.  Cf. Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

Finally, Mr. Feliciano argues cumulative error due to the purported withholding of exculpatory material in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).  A new trial is warranted for a Brady violation when the government suppresses otherwise unavailable evidence favorable to the defendant and "had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different." United States v. Newton, 44 F.3d 913, 918 (11th Cir. 1994).  Mr. Feliciano cannot make the required showing here.  For example, he argues that he learned at trial for the first time that Mr. Trubey claimed he went to a court hearing with him between

18

casing First Bank on April 1st and the attempted robbery.  But the record indicates that the government did disclose that information previously.  For example, counsel for Mr. Feliciano asked Mr. Trubey at trial:  "I don't know if you testified about this, but isn't it a fact that you told Special Agent Manning that on the day of the attempted bank robbery that Mr. Feliciano had a court appearance [on April 1st]?"  None of Mr. Feliciano's other allegations of Brady violations have merit either.  Messrs. Trubey and Quinn did not give "starkly contradictory" statements on what happened to the fake bomb, and Special Agent Manning's investigation of whether Mr. Feliciano had a probation meeting on April 11th could have easily been duplicated by the defense.

Although we take exception to the District Court's handling of the expert assistance request, the alleged errors in the trial, when viewed individually and cumulatively, did not result in a trial that "was fundamentally unfair and outside the bounds of the Constitution."  See Conklin, 366 F.3d at 1210.  Mr. Feliciano's cumulative error argument fails.

## V.

Mr. Feliciano's conviction of Count Four, the 18 U.S.C. § 924(c) charge for using and brandishing a gun in the commission of the April 11th robbery, is vacated.  Mr. Quinn testified he never saw Mr. Feliciano with a gun on April 11th, and Mr. Trubey testified he knew "for a fact" that Mr. Feliciano did not have one

19

that day.  None of the eyewitnesses on April 11th saw a gun.  The government's evidence is plainly insufficient.  See United States v. Powell, 469 U.S. 57, 67, 105 S. Ct. 471, 478 (1984); see also Rosemond v. United States, ___ U.S. ___, ___ S. Ct. ___, 2014 WL 839184 (Mar. 5, 2014).

The government's decision to charge Count Four in this case raises concerns beyond those we have expressed.  The government clearly knew there were problems with this charge before trial.  At a hearing in the District Court on January 30, 2012, the government told the court it would not be going forward with its prosecution of Count Four.  Contrary to that representation to the District Court, it proceeded with the prosecution of Count Four anyway.  When the government filed its initial brief in this appeal, it argued that Mr. Quinn's scant testimony at trial was sufficient to support Count Four.  But then the government filed an amended brief, admitting that Mr. Quinn's testimony was a far too "slender reed" to support the Count Four conviction, and admitted the evidence was insufficient.  While it is good that the government eventually reached an understanding of the inherent weakness in Count Four, they knew from interviews with Messrs. Trubey and Quinn long before trial that no one saw a gun, and that Mr. Trubey in particular said there definitely was no gun because Mr. Feliciano's one and only gun had been pawned on April 1st.  Again in this regard, we expect more from United States prosecutors.

20

## VI.

Mr. Feliciano concedes there was sufficient evidence on Count Five, the 18 U.S.C. § 922(g) felon-in-possession charge, but nonetheless asks for a new trial because "it is difficult or impossible to retrospectively ascertain the impact of the above-described cumulative errors on the fairness of that verdict."  We have already rejected the cumulative error claim.  Because the evidence for Count Five is uncontroverted, this claim fails.

## VII.

We **REVERSE** Count Four and **AFFIRM** Mr. Feliciano's remaining convictions.

PRYOR, Circuit Judge, specially concurring:

I concur in the majority opinion in all respects except for the reprimand of the prosecutor based on his comments in closing arguments about the reliability of Feliciano's expert witness. The majority faults the United States for discrediting the expert's opinion as based on the magnetic resonance imaging of Feliciano's back from 11 years earlier. Although the majority declares that "[t]his conduct does not meet the standard we expect of United States prosecutors," any disadvantage suffered by Feliciano based on the prosecutor's closing arguments was not caused by the United States, but by the denial by the district court of Feliciano's ex parte request for expert assistance.

Like the majority, I do not understand why the district court denied Feliciano's request for a magnetic resonance imaging at his expense, but I would not rebuke the United States for challenging the opinion of Feliciano's expert as based on stale information. The United States made the very argument that it would have made had the district court granted Feliciano's request for a new magnetic resonance imaging and had Feliciano's expert then relied only on older medical information in testifying about his opinion. The majority assumes that a more recent magnetic resonance imaging would support Feliciano's theory that he could not have leapt over the teller counter, but that assumption is unwarranted. After all, Feliciano's cohort, Christopher Quinn, testified that Feliciano leapt over

22

the teller counter, as corroborated by surveillance images and the testimony of credit union witnesses. And an updated magnetic resonance imaging might have undermined the opinion of Feliciano's expert, in which case the expert would not have relied upon it and the United States could have discredited his opinion on cross examination by asking the expert why he failed to account for it. The prosecutor would have been entitled to highlight in his closing arguments the deficiencies of the expert's opinion, and the majority could not fault him for doing so.

Worst of all, the majority creates this argument about improper prosecutorial conduct out of thin air. Feliciano conceded at oral argument that it was not "unfair" for the prosecutor to argue that the defense expert relied on stale medical reports because "the die had been cast" when the district court allowed cross examination of Feliciano's expert about those reports. Feliciano did not even object to these comments during closing arguments. And, on appeal, Feliciano complained instead that, in closing, the prosecutor misstated the evidence about eyewitness identifications and his physical appearance.

The majority also fails to explain why this conduct falls short of what we expect of federal prosecutors. It is easy to nitpick a prosecutor's closing arguments. But, if we do so, we owe an explanation of why the comments were troubling and a legal citation to support that explanation. The majority neglects to do both and, as

23

a result, fails to provide an articulable standard for prosecutorial conduct going forward. I reject the notion that, to undo any harm the district court caused by its own error, prosecutors must refrain from making proper arguments. Unlike the majority, I am not "troubled by what the government did here," and I am baffled by what the majority hopes to proscribe in the future.