[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11849
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cr-20823-DLG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TERRENCE JAMES JACKSON,
a.k.a. Tay-Tay,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 9, 2015)

Before TJOFLAT, WILSON and JILL PRYOR, Circuit Judges.

PER CURIAM:

Terrence Jackson appeals his convictions and sentence imposed after a jury convicted him of one count of conspiracy to commit bank robbery and one count of bank robbery with a dangerous weapon, all in violation of 18 U.S.C. §§ 2, 371, and 2113(a), (d).  After careful review of the record and the parties' briefs, we affirm.

I.

A grand jury indicted Jackson on three charges:  conspiracy to commit bank robbery (Count1); robbing a bank by "assault[ing] and put[ting] into jeopardy the life of a person by the use of a dangerous weapon, that is, a firearm,"  (Count 2); and brandishing a firearm during and in relation to a crime of violence, specifically, the armed robbery (Count 3).  He pled not guilty and proceeded to trial, where the government presented the following evidence.

On April 11, 2013, the JetStream Credit Union branch, located inside Miami's Mercy Hospital, was robbed.[1]  According to two men who admitted to participating in the robbery, both of whom testified at Jackson's trial, Jackson was involved in the planning and execution of the robbery.  One of these men, Garriett Hicks, testified that he met Jackson through a coconspirator named Alfred Walker.  After Walker proposed robbing the credit union, the three began planning their

---

[1] Because Jackson mounts a challenge to the sufficiency of the evidence against him, we recite the facts relevant to his conviction in the light most favorable to the jury's verdict. *See United States v. Haile*, 685 F.3d 1211, 1219 (11th Cir. 2012).

2

execution of the scheme.  All three drove to the hospital four or five times to familiarize themselves with the route, and Walker and Jackson went inside the hospital several times to familiarize themselves with the entry and exit points.

Hicks testified that, on the evening of April 10, the three further discussed the robbery plan.  Walker and Jackson introduced Hicks that night to Tavarius Smith, a fourth conspirator.  Smith brought a gun with him to the meeting, but Hicks testified he told Smith that a gun was not necessary for the robbery.  The following day, the four agreed to rob the credit union.

According to Hicks, he was tasked with remaining outside the hospital as a lookout, while Walker, Jackson, and Smith would enter and rob the credit union.  On the morning of April 11, Hicks drove his car to the hospital.  The others rode separately in a car Walker drove.  After Walker parked his car at the hospital, Hicks circled the parking lot until he saw the three emerge from the hospital and reenter Walker's car.  The two cars left the credit union, were separated briefly by traffic, then drove to a house to divide the cash.  Inside the house (which Hicks believed to be Jackson's), the men poured money on a bed, and Jackson handed Hicks a wad of cash.  During this interaction, according to Hicks, Jackson removed a gun from his waistband and placed it on the bed.  Hicks also saw Smith with a gun.  Hicks was the first to cooperate with the police, a process that began the day after the robbery.

Walker also testified at Jackson's trial, admitting that he robbed the credit union along with Jackson, Hicks, and Smith. Walker confirmed that he had enlisted Jackson to participate and that he, Jackson, and Hicks cased the bank approximately four times leading up to the robbery. He also confirmed that the night before the robbery Smith showed the group a gun. He added that Hicks had told him "from the beginning that we didn't need no gun, but if it was to protect the safety, it was . . . to be brought." Doc. 98 at 175. Walker described each conspirator's role in the robbery: he would jump behind the counter to grab the money, Smith would keep watch while Walker was taking the money, Jackson would make sure no one in the credit union alerted police or anyone else, and Hicks would serve as a lookout outside the hospital.

During the robbery, according to Walker, Jackson (who was wearing purple or blue gloves) entered the credit union last. At that point, Walker testified, Jackson caught a woman who was not lying on the ground like the others, sprayed her with pepper spray, and then ran out of the credit union. Walker and Smith then left too. Walker, like Hicks, testified that the four rendezvoused at a house where they divided the money. Later that day, Walker accompanied Jackson to several places where Jackson spent large sums of money.

Several credit union employees also testified to the events that occurred on April 11. Jacqueline Perez, a teller, testified that the robbery began when one man

4

jumped over the teller counter, kicking her in the chest.  The robbers pepper sprayed the tellers and told them to get down and not to look.  Perez testified that Marlene Reyes, the credit union's branch manager, then "came around and saw [Perez] on the floor," at which point "another [robber] jumped in . . . by Marlene's office."  Doc. 98 at 42.  Perez testified that, "[o]nce he st[ood] there," she "tried to look to Marlene," but that "he said, 'Don't look because I'll shoot.'"  *Id.*  Perez then testified that the robber who jumped in and said "don't look" had a weapon on the left side of his waistband.  She clarified that the weapon was a gun.  Reyes testified that she was in her office located just in front of the teller counter when she heard a sound like something falling.  She went over to where the tellers were and saw them lying on the floor while a man took money from the teller drawers.  As she was looking at the tellers, a man wearing purple gloves pepper sprayed her.  When the government showed Reyes a still photo taken from one of the credit union's security cameras, she identified the man as Jackson, stating, "I can see his purple gloves." *Id.* at 77.

After the government's case in chief, Jackson moved for judgment of acquittal, which was denied.  Defense counsel proffered one witness, Special Agent George Nau, and attempted to elicit testimony regarding the dearth of evidence the investigation uncovered that directly implicated Jackson.  The district court sustained several of the government's hearsay objections, restricting Nau's

5

testimony to portions of the investigation in which he personally participated. After Nau denied participating in several aspects of the investigation, his testimony was minimal. Defense counsel renewed a motion for judgment of acquittal, which again was denied. The jury convicted Jackson of Counts 1 and 2 but acquitted him of the charge in Count 3. Defense counsel again reviewed the motion for judgment of acquittal, which the court denied.

The probation office's presentence investigation report recommended that the district court sentence Jackson as a career offender under § 4B1.1 of the sentencing guidelines. *See* U.S.S.G. § 4B1.1(a) ("A defendant is a career offender if . . . the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."). Jackson had been convicted of carjacking with a firearm and robbery with a firearm (and was sentenced to 82.5 months' imprisonment on November 1, 2002) and of aggravated assault on a law enforcement officer (and was sentenced in 2003 to five years' imprisonment, concurrent with his 82.5 month sentence). The offenses were committed on August 20, 2001 and August 21, 2001, respectively. As a result, Jackson's offense level was 34 and his criminal history category was VI, which made his guideline range 262 to 327 months. At sentencing, the district court applied the career offender enhancement over Jackson's objection (in which he argued the two convictions should be treated as only one because, he maintained, they would have

6

been treated as one under the career offender rules in place at the time he was convicted of those offenses).  Ultimately, the court imposed a below-guidelines sentence of 168 months' imprisonment.

This is Jackson's appeal.

## II.

## A.

Jackson first challenges the district court's limitation of Special Agent Nau's testimony to the parts of the investigation in which Nau directly participated. Jackson contends that the court's refusal to permit questioning about the dearth of evidence against him limited his defense strategy of illustrating that Hicks and Walker concocted Jackson's involvement in an effort to obtain a reduced sentence based on their assistance to the government.  We review the district court's exclusion of portions of Nau's testimony as hearsay for an abuse of discretion. *United States v. Walker*, 59 F.3d 1196, 1198 (11th Cir. 1995).  Moreover, for nonconstitutional errors, we will reverse only if the testimony's exclusion affected Jackson's substantial rights. *See United States v. Range*, 94 F.3d 614, 620 (11th Cir. 1996).

Notably, the district court never prevented Nau from testifying about portions of the investigation in which he directly participated.  Even assuming *arguendo* that the court erred in excluding portions of Nau's testimony based on

7

his indirect knowledge, we conclude that the exclusion did not affect Jackson's substantial rights.  The hearsay rulings did not prevent Jackson from presenting his defense theory that Hicks and Walker fabricated Jackson's participation in the hopes of receiving a lower sentence because of their assistance.  Jackson confronted the government's witnesses at trial, and he elicited, among other things, testimony from Hicks and Walker that they lied to police about how much they had received in robbery proceeds and did not initially identify Jackson to the police, and from Walker that he was cooperating with the government so he could "go home a little early."  Doc. 98 at 138, 156; Doc. 99 at 243-45, 249-50.  Jackson also had an opportunity to argue his theory during closing argument.[2]  Thus, Jackson cannot shown reversible error.

B.

Next, Jackson challenges the sufficiency of the evidence against him.  We review the sufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility evaluations in favor of the jury's verdict."  *United States v. Haile*, 685 F.3d 1211, 1219 (11th Cir. 2012).  To sustain a conviction on the conspiracy count, the government was required to show  (1) an agreement between Jackson and at

---

[2] The government asserts that Jackson failed to have the closing arguments transcribed, but regardless of the reason, we have no transcript with which to confirm whether Jackson did or did not make this argument in closing.

least one coconspirator to achieve an unlawful objective, (2) Jackson's knowing and voluntary participation in the agreement, and (3) an overt act by a conspirator in furtherance of the agreement. *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). Jackson challenges the second element, asserting that his coconspirators' testimony about his participation was insufficient to sustain his conviction because it was uncorroborated. This assertion, however, is not an entirely accurate characterization of the record. First, Walker's testimony regarding Jackson's participation in the planning and execution of the robbery was consistent with Hicks's story. Thus, each of these witnesses' testimony was corroborated by that of the other. Second, Reyes's testimony that the man who pepper sprayed her wore purple gloves (as well as her identification of the man wearing the gloves in a still photo taken from the credit union's security camera) matched Walker's description of Jackson's attire on the day of the robbery. Third, Reyes and the bank tellers also testified to other facts — for example, that one robber (Hicks) jumped the counter, and that another (Jackson) pepper sprayed the only woman who was not on the ground — that corroborated other elements of Jackson's coconspirators' testimony. The jury apparently credited the coconspirators' testimony in finding that Jackson participated in the conspiracy. Our case law does not require more. *See United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) ("The jury has exclusive province over the credibility

9

of witnesses, and the court of appeals may not revisit this question unless [the testimony] is incredible as a matter of law." (internal quotation marks omitted)).[3] Thus, the evidence was sufficient to sustain Jackson's conviction on the Count 1 conspiracy.

As regards Jackson's conviction for the substantive robbery count, the government was required to establish that Jackson used force or intimidation to take property from the credit union and that, during the course of that offense, he assaulted a person or put the person's life in jeopardy with a dangerous weapon. *See* 18 U.S.C. § 2113(a), (d). Jackson contests the "dangerous weapon" element, pointing specifically to the jury's acquittal on the Count 3 firearm brandishing charge. Relatedly, he asserts that the only evidence of any weapon he carried was pepper spray, which does not constitute a dangerous weapon under the law.

As a preliminary matter, we reject Jackson's argument that an inconsistent jury verdict itself constitutes reversible error. *See United States v. Mitchell*, 146 F.3d 1338, 1344 (11th Cir. 1998) ("The Supreme Court has plainly determined that jury verdicts are 'insulate[d] from review' on the ground that they are inconsistent." (quoting *United States v. Powell*, 469 U.S. 57, 68-69 (1984))). Moreover, the evidence admitted at trial was sufficient to permit the jury to infer

---

[3] Jackson also contends that, setting aside the uncorroborated testimony of the coconspirators, the only evidence of his participation in the conspiracy and in the robbery is his conduct after the robbery occurred. Because we have concluded that the evidence regarding Jackson's participation in the planning and execution of the robbery was sufficient to sustain a conviction, we need not address this argument.

10

that Jackson carried a gun during the robbery.  Perez testified that she saw a gun on the waistband of the man who approached Reyes, and Reyes testified that the man who pepper sprayed her wore purple gloves — the same detail to which Walker testified in describing what Jackson wore during the robbery.  Reyes's testimony that she was standing when she was pepper sprayed further supports an inference that it was Jackson who sprayed her because Walker testified that Jackson pepper sprayed the one woman who was not on the ground.  The jury therefore could have inferred that Jackson, the man with the purple gloves who confronted and pepper sprayed Reyes, was carrying a gun in his waistband during the robbery.

The evidence was further bolstered by Hicks's testimony that he saw Jackson take a gun from his waistband at the rendezvous place where the four fled to divide the proceeds.[4]  The jury reasonably could infer, based on this evidence, that Jackson was guilty of the offense charged in Count 2.[5]  *See Haile*, 685 F.3d at 1219 (requiring the court to draw all reasonable inferences in favor of the jury's verdict).

---

[4] The prosecution also asked Hicks, whether "the day *after* the robbery, that same morning when you went to [Jackson's] house, you saw him remove a weapon from his clothing.  Where in his clothing was the weapon?"  Hicks responded "On his hip."  Doc. 98 at 123-24 (emphasis added).  Jackson contends that this testimony about the following day is the only reference in Hicks's testimony to a gun Jackson purportedly carried, but it is not.  As discussed above, Hicks testified that the four robbers drove straight from the credit union to a house, where Hicks saw Jackson with a gun.  To the extent Hicks's testimony about the day he saw Jackson with a gun is internally inconsistent, this went to Hicks's credibility, and we will not disturb the jury's credibility findings.  *See Feliciano*, 761 F.3d at 1206.

[5] Because we conclude the jury could have found Jackson himself carried a gun during the robbery, we need not address the government's alternative argument that Jackson could be held responsible for the gun Smith allegedly carried.

C.

Finally, Jackson challenges his classification as a career offender under U.S.S.G. § 4B1.1, arguing the grouping of his 2001 carjacking and aggravated assault convictions violates the ex post facto clause of the United States Constitution. We review Jackson's claim, which presents an issue of law, *de novo*. *See United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000). The ex post facto clause bars the application of laws that retroactively alter the definition of a crime or increase the punishment for criminal conduct. *United States v. Reynolds*, 215 F.3d 1210, 1213 (11th Cir. 2000). For a law to violate the clause, it must "apply to events occurring before its enactment" and "disadvantage the offender affected by it." *Id.* A district court must apply the guidelines in a way that does not violate the clause: if the guidelines manual in effect on the date of sentencing would, then the court must apply the manual that was in effect on the date the relevant crime was committed. U.S.S.G. § 1B1.11(b)(1); *United States v. Bailey*, 123 F.3d 1381, 1403 (11th Cir. 1997).

Under § 4B1.1 of the sentencing guidelines, a defendant is a career offender if (1) he was at least 18 years old at the time he committed the instant offense; (2) the instant offense is a felony either involving a crime of violence or a controlled substance; and (3) he has at least two prior felony convictions, each of which involved either a crime of violence or a controlled substance. U.S.S.G. § 4B1.1(a).

12

Jackson contends that the 2013 sentencing guidelines manual that the district court applied a new rule (*i.e.*, one not in effect in 2001) for determining whether his convictions for carjacking and aggravated assault counted as one conviction.  He asserts that the district court should have applied the old rule (which, he argues, would require the two convictions to be treated as one for sentencing purposes) rather than the new one (which permitted the court to count the convictions separately).  But the Supreme Court and this Court have rejected the view that a sentence enhancement based on a conviction or convictions sustained before the enhancement came into force constitutes an increased punishment for that past criminal conduct.  *See Gryger v. Burke*, 334 U.S. 728, 732 (1948) ("The sentence as a . . . habitual criminal is not to be viewed as . . . additional penalty for earlier crimes.  It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because [it is] a repetitive one."); *United States v. Abraham*, 386 F.3d 1033, 1038 (11th Cir. 2004) (holding the federal "three strikes law" mandating a life sentence for a defendant convicted of a serious violent felony who was previously convicted of "one or more serious violent felonies and one or more serious drug offenses" did not violate the ex post facto clause for the reasons set forth in *Gryger*); *Reynolds*, 215 F.3d at 1213 (holding application of Armed Career Criminal Act did not violate the ex post facto clause even if the conviction on

13

which the enhancement was based predated the Act).  Thus, Jackson's argument lacks merit.

III.

For the foregoing reasons, we affirm Jackson's convictions and sentence.

**AFFIRMED.**