[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11496

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

COLLICE REID,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60315-CMA-1

_____

Before JILL PRYOR, BRASHER, and MARCUS, Circuit Judges.

PER CURIAM:

Collice Reid appeals his conviction for use and carrying of a firearm during and in relation to a crime of violence causing death, in violation of 18 U.S.C. §§ 924(j) and 2.  On appeal, he argues that there was insufficient evidence to support his conviction.  After thorough review, we affirm.

We review "sufficiency of evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict."  *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).  We will affirm the denial of a motion for a judgment of acquittal if a reasonable jury could conclude that the evidence established guilt beyond a reasonable doubt.  *Id.*  The evidence need not exclude every reasonable hypothesis of innocence for a jury to find guilt beyond a reasonable doubt.  *United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (*en banc*).  Instead, the jury is free to choose among alternative, reasonable interpretations of the evidence.  *Id.*

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence."  *United States v. Mieres-Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990) (quotations omitted).  Circumstantial evidence can be, and often is, more than sufficient to establish guilt

beyond a reasonable doubt. *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982). But when the government relies on circumstantial evidence to prove an element of the offense, reasonable inferences from the evidence, not mere speculation, must support the conviction. *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011). That said, the jury has exclusive territory over witness credibility, and we will not revisit witness credibility unless it is "incredible as a matter of law." *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) (quotations omitted). Testimony is deemed "incredible" if it is unbelievable on its face, where, for instance, the witness testified to facts he "physically could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (quotations omitted).

Under § 924(c), it is illegal to use or carry a firearm during a crime of violence. 18 U.S.C. § 924(c). A "crime of violence" is defined in § 924(c)'s "elements clause" as a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). We've held that aiding and abetting Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause. *United States v. Wiley*, 78 F.4th 1355, 1363 (11th Cir. 2023). A defendant violates the Hobbs Act when he "obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of [§ 1951]." 18 U.S.C. § 1951(a). The Hobbs Act defines robbery, in part, as "the unlawful taking or obtaining of

personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession." *Id*. § 1951(b)(1).

Under § 924(j), it is punishable by death or imprisonment for any term of years or life, when the defendant, in the course of a violation of § 924(c), causes the death of another through use of a firearm, where the killing is defined as a murder in 18 U.S.C. § 1111. 18 U.S.C. § 924(j)(1). Murder is "the unlawful killing of a human with malice aforethought," and any murder "committed in the perpetration of . . . robbery . . . is murder in the first degree." 18 U.S.C. § 1111(a). The felony murder statute "reflects the English common law principle that one who caused another's death while committing or attempting to commit a felony was guilty of murder even though he did not intend to kill the deceased." *United States v. Tham*, 118 F.3d 1501, 1508 (11th Cir. 1997). Any time that commission of a felony causes a death, the malice of the underlying felony transforms the felony into a felony murder, regardless of whether the death was unintentional or accidental. *Id*. The defendant does not need to have intended to cause a death to be guilty of first-degree murder under § 1111(a), but he "need only have intended to commit the underlying felony; no other mens rea is required." *Id*.

Under § 2, anyone who aids or abets in the commission of an offense is punishable as a principal. 18 U.S.C. § 2(a). The aiding-and-abetting statute reflects the idea that a person can be responsible for a crime if he helps another to complete its commission, even

if he does not personally carry out the entire crime. *Rosemond v. United States*, 572 U.S. 65, 70 (2014). To be found guilty of aiding and abetting under § 2, the government must prove that the defendant (1) took an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission. *Id.* at 71. The government must prove that the defendant intended to complete the specific and entire crime charged. *Id.* at 76.

For an aiding and abetting violation of § 924(c), if the defendant himself did not carry a firearm, he must have had advance knowledge of a "confederate's design to carry a gun," so that he had the opportunity to attempt to alter the plan or, if unsuccessful, withdraw from the enterprise. *Id.* at 78. A defendant "should not expect . . . the capacity to hedge his bets, joining in a dangerous criminal scheme but evading its penalties by leaving use of the gun to someone else." *Id.* at 80. If the defendant did not discover his confederate's design to carry a gun until after his actions of aiding were completed, there may not have been a realistic opportunity to quit the crime. *Id.* at 78. There, the defendant has not shown the requisite intent to assist a crime involving a gun. *Id.* But the jury may permissibly infer the defendant's knowledge that a confederate will use a firearm if he continues to participate after a firearm is displayed. *Id.* at 78 n.9; *see also Steiner v. United States,* 940 F.3d 1282, 1292 (11th Cir. 2019) (affirming because the jury could infer that the defendant still had a chance to quit the crime after he learned of his co-conspirators' use of firearms during the crime, where the defendant had time to have a discussion, removed a car from a ditch, and hid, all after the guns were fired).

6                    Opinion of the Court                    23-11496

Here, Reid's § 924(j) conviction arose out of November 2015 armed robbery Reid had participated in as a member of Onsight, a violent criminal crew committing frequent drive-by shootings, home invasion robberies, and murders in and around Broward County, Florida.  According to the trial testimony, Eric Hunter was Onsight's leader, and Joshua Glaze, Gregory Stickney, Derrick Slade, Brandon Greene, and Marcello Gordon also were part of the group.  Hunter admitted that he had a well-known reputation in the community for being a dangerous murderer whose regular practice was to shoot robbery victims who tried to resist him; Glaze and Stickney confirmed that the local community feared Hunter; and Gordon explained that the crew was called Onsight because they committed robbery and murder "upon sight."  Hunter added that Reid saw him and the other Onsight members with firearms in their possession "[a] majority of the time," including when Reid drove Onsight members to commit robberies.  Gordon and Stickney gave similar testimony, and Gordon even said he had seen Reid holding one of Onsight's automatic assault rifles.

The trial evidence showed that Reid had been a getaway driver and lookout for Onsight during at least four previous attempted or completed armed robberies where some member of the group shot their firearms: (1) Hunter and Gordon testified about an attempted armed robbery of a convenience store employee where Reid had watched as Gordon or Greene shot up the victim's car; (2) Hunter and Gordon testified that Reid was the getaway driver for an armed robbery at a youth football game during which Hunter and Gordon repeatedly shot the victim at close range

23-11496                Opinion of the Court                7

as they robbed him; (3) Gordon testified that he and Reid engaged in an attempted armed robbery of a man that Reid saw wearing a diamond necklace at a store and that Reid had told Gordon he didn't care if Gordon had to kill the man (though Gordon ultimately called off the robbery); and (4) Hunter and Glaze testified that the night before the Hobbs Act robbery underlying Reid's instant § 924(j) conviction, Reid was a getaway driver and lookout for an armed robbery during which Slade shot and killed a victim.

As for the November 2015 armed robbery and homicide that formed the basis of Reid's conviction, the trial evidence reflected that Hunter had assembled Onsight, armed with weapons, to rob a drug dealer.  Hunter testified that Reid watched as Hunter and Gordon took two automatic assault rifles out of a house to use during the robbery and put them into one of the cars taking Onsight to the robbery. Stickney similarly testified that Gordon and Slade carried automatic assault rifles into the robbery.  Hunter also testified that he was carrying a handgun and that it was visible to Reid as they drove to the robbery.  Hunter and Gordon both testified that, after the eruption of automatic assault rifle gunfire from Slade and Gordon -- which killed one person and severely wounded two others -- and the gunshots from Hunter firing his handgun at potential witnesses, Reid drove the Onsight members away from the robbery location.  Gordon similarly testified that both he and Hunter brought an automatic assault rifle to the robbery, taking them out of a house and putting them in the trunk of Reid's car before Reid drove with them to the robbery location.  Gordon specified that, when they got out of the car, he carried an automatic

assault rifle, Slade carried an automatic assault rifle, and Hunter carried a handgun. And, Gordon said, after he and Slade shot multiple rounds from their automatic assault rifles into the garage of the home that they were robbing, a female victim "kept screaming, making a lot of noise" until Gordon eventually shot her in the back before kicking her, running out and getting into the waiting getaway cars, one of which was driven by Reid.

The jury also saw a video of Hunter, Reid and Gordon together in a car, during which Gordon was waving his firearm in the air next to Reid. And the jury heard Reid say, during an interview with law enforcement, that he knew that Hunter and Gordon were using his car to drive to "the shooting and stuff" and when "they killed people"; that he had seen Gordon and Hunter with guns and Gordon was "always" carrying a firearm; that he had overheard Slade stating that he shot and killed a victim during the earlier November robbery; that he heard Hunter telling people that he had murdered someone; and that he was present during the shoot-out and saw Gordon repeatedly fire his gun at another person.

On this record, the government presented ample evidence at trial in support of Reid's § 924(j) conviction.[1] As for the first element of § 924(j) -- a violation of § 924(c) -- Reid conceded in his

---

[1] To the extent Reid argues that each of the government's witnesses, including Hunter, Gordon, and Stickney, had a personal motive to testify against Reid, determinations of credibility were made by the jury, who were free to choose a reasonable interpretation of the evidence. *Feliciano*, 761 F.3d at 1206; *Cruz-Valdez*, 773 F.2d at 1545.

motion for a judgment of acquittal that the government proved that he aided and abetted a Hobbs Act robbery, which qualifies as a crime of violence.  As for the second element -- the use or possession of a firearm in furtherance of the robbery -- the government presented evidence that Reid knew that the other members were armed during the offense, which provided Reid with advance knowledge and time to withdraw from, or alter, the plan.  As for the third element -- that the death was caused by a firearm -- the parties stipulated that the victim's death was caused by a gunshot wound in his torso.

Reid argues, nevertheless, that the government did not put forth sufficient evidence in support of his § 924(j) conviction because it did not prove that he had the requisite mens rea to commit the crime, which, he says, is the specific intent to cause the death of another through the use of a firearm.  But we need not decide whether the government was required to prove that Reid intended for the use of a firearm to cause a death -- as opposed to showing that he intended to commit the underlying armed robbery -- because even if so, it squarely met its burden.

As we've detailed, the government presented evidence that Reid was driving, or otherwise in the car, on multiple occasions when firearms were carried and shots were fired.  Hunter testified that he was armed a majority of the time he was with Reid, which included possession of AK-47 rifles in the immediate area of Reid, and a video clip played at trial showed Reid in a car sitting next to another group member who was openly waving around a firearm.

In addition, Gordon testified that, when he and Reid planned to rob a person wearing a diamond necklace, although they did not proceed with the robbery, Reid had said he did not care that they might have to kill the victim.  The government also presented testimony that Reid knew that members of the group fired their guns at other people during the commission of the crimes.  Among other things, Hunter and Gordon testified that Reid participated as a driver in the robbery at a football game, and he was with the group while Hunter and Gordon were armed.  And, notably, members of Onsight testified that Reid had watched them pack rifles into the car before driving to the robbery on the night in question.

Based on all of the evidence, a reasonable jury could conclude that, when he went to the robbery in November 2015, Reid knew that Slade, Gordon, and Hunter all regularly shot their robbery victims and he knew that they were, yet again, armed as he drove them to commit a robbery.  And, with the knowledge that his armed confederates often shot and sometimes killed their robbery victims, Reid aided them in committing another armed robbery. This record thus contains more than enough evidence for a reasonable jury to find that Reid committed a violation of § 924(j), and that he did so with the requisite mens rea -- that is, the intent to cause the death of another through the use of a firearm.

**AFFIRMED.**