[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10340
Non-Argument Calendar

_____

D.C. Docket No. 3:18-cr-00006-HLA-JBT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONALD JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 28, 2020)

Before ROSENBAUM, BRANCH, and MARCUS, Circuit Judges.

PER CURIAM:

Ronald Johnson appeals his convictions for (1) distributing a substance containing a detectable amount of fentanyl and methoxyacetyl fentanyl that caused the death of another, and (2) carrying a firearm during and in relation to a drug trafficking offense.  He alleges three errors on appeal.  First, Johnson argues that the district court erred in denying his motion for a judgment of acquittal on Count One because no reasonable construction of the evidence permitted the jury to find beyond a reasonable doubt that the victim purchased from him the drug that caused her death.  Second, he argues that the district court erred in denying his motion for a judgment of acquittal on Count Three because no reasonable jury could find beyond a reasonable doubt that he possessed a firearm during an undercover drug transaction.  Third, he argues that the district court abused its discretion in admitting a photograph of the victim's deceased body when (1) the body had been moved from where the victim died and (2) the photograph did not establish any element of the crime charged.  After a review of the record, we affirm.

## I.    Background

Johnson was charged in a six-count superseding indictment which primarily alleged he dealt drugs that caused the death of a young female victim.[1]  At trial, the

---

[1] Specifically, Johnson was charged with distributing a substance containing a detectable amount of Fentanyl and MF, causing the death of S.W. in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count One); distributing MF, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count Two); carrying a firearm during and in relation to a drug trafficking offense on September 29, 2017—the subject of Count Two—in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three); possessing with intent to distribute a controlled substance containing cocaine

2

government sought to prove, among other charges not relevant to this appeal, that (1) Johnson was the dealer of the fentanyl and methoxyacetyl fentanyl that caused the victim's death during the early morning hours of September 17, 2017, and (2) Johnson carried a gun with him during an undercover drug buy on September 29, 2017. Because Johnson challenges the sufficiency of the evidence for those convictions, we lay out the evidence related to those charges before reviewing the circumstances surrounding the admission of the challenged photograph.

A. Evidence of Johnson Dealing the Lethal Dose of Fentanyl

The government first called Chris LaValley, a detective for the Jacksonville Sheriff's Office. LaValley testified about a list of the wireless networks to which the victim's phone had connected the day before her death,[2] which showed that she had spent most of the day at her home and had stopped by McDonald's before going to the nightclub where she worked as a waitress around 6:45 p.m. The victim's phone connected to her workplace network a few times after midnight on September 17—the day of her death. On the morning of her death, the victim's

_____

base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count Four); carrying a firearm during and in relation to a drug trafficking offense on October 2, 2017—the subject of Count Four—in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Five); and possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2) (Count Six). Johnson was found not guilty of Counts Four and Five at trial, and admitted at trial that he was guilty of Counts Two and Six. Thus, the only counts relevant to this appeal are Counts One and Three.

[2] LaValley testified that the connection time was simply when the device connected to a WiFi and did not show how long the device remained connected.

3

phone connected to her home network at 3:29 a.m. and remained on that network until 7:23 p.m.

Johnson's number was found in the victim's phone under the name "Tiki," and there were text messages and calls exchanged between the two. These communications showed that, in the two days leading up to her death, Johnson and the victim had made arrangements to meet three times. These texts strongly indicated drug sales between the two. For example, on September 16, 2017, at 12:48 a.m., the victim wrote "Thanks for hooking me up I made a little more then [sic] I thought I would make but that bc I gave them less then [sic] what they bought and sold the rest to another friend." She sent another text asking, "If it's that strong why don't you cut it?" Johnson responded at 12:49 a.m., stating, "I'm the fire man."

An employee in the chemistry section of Jacksonville Regional Operations Center of the Florida Department of Law Enforcement testified that the drugs Johnson delivered to an undercover officer on September 29 were methoxyacetyl fentanyl.[3] An investigator with the medical examiner's identified a purple bag found at the scene of the victim's death which contained items indicative of

---

[3] According to this witnesss, methoxyacetyl fentanyl is an opioid substance stronger than morphine and with a very similar chemical compound to fentanyl and acetyl fentanyl. A user who asked for heroin but received methoxyacetyl fentanyl might not know what she is getting, as they are visually indistinguishable. There was some evidence that the victim believed she was buying heroin, as she had a previous bout of addiction to that drug, and when the undercover officer approached Johnson, he asked for heroin before receiving methoxyacetyl fentanyl.

intravenous drug use, such as spoons, syringes, and a lighter.  A detective later testified that these items were typical of drug use.

The government called Dr. Valerie Rao, who performed the autopsy on the victim's body.  Dr. Rao testified that the position of the victim's body and the track marks on her arm indicated that she died on the toilet after injecting drugs.  Dr. Rao testified that the autopsy and toxicology report showed that the victim's blood contained caffeine, codeine, alcohol at .138 milligrams per deciliter (well over the legal limit), 1.7 nanograms of fentanyl, and an indeterminate amount of methoxyacetyl fentanyl.[4]  Rao concluded that the "but for" cause of the victim's death was fentanyl and methoxyaceytl fentanyl.[5]

To track Johnson's movements the night of September 16, 2017, the night before the victim died, the government called Joseph Sierra, a records custodian employee at T-Mobile.  Sierra testified as to how historical cell site data for Johnson's phone number was gathered and introduced maps based on that data showing the location of the cell sites to which Johnson's cell phone had connected

---

[4] Because methoxyacetyl fentanyl is a new drug, the toxicologist was unable to quantify the amount in the victim's system.

[5] Methoxyacetyl fentanyl, while a separate drug than fentanyl, is "very similar" to the chemical compound of fentanyl.  As the toxicologist explained it, fentanyl is the base of the compound, with methoxyacetyl fentanyl constituting a slight modification of the base drug.  Dr. Rao later called them "variations" of the same drug.  Dr. Rao testified that "fentanyl and methoxyacetyl fentanyl" were the cause of the victim's death.  She also stated that methoxyacetyl fentanyl, on its own, was a contributing factor to the death.

in the days leading up to the victim's death.  Based on that data, Detective Bisplinghoff explained how Johnson's historical cell site data showed that on September 16, Johnson twice made a trip from his apartment to where the victim worked on September 16, 2017.

Detective Bisplinghoff also testified that he reviewed text communications that the victim made through her mother's Apple iPad Mini.  The victim had been in communication with Johnson since February 23, 2017.  The only drug-related conversation he found from September 15 through 16 was between the victim and Johnson.

Detective Michael Boree, an undercover detective for the Jacksonville Sheriff's Office, testified about an undercover drug deal he conducted with Johnson on September 29, 2017, twelve days after the victim died.  Boree first made contact with Johnson by posing as a friend of the victim's looking for drugs. Boree wore a wire for the undercover transaction, and the video of the transaction along with a transcript of the transaction were admitted into evidence.  During the drug transaction, Johnson said "be careful with that dog. That shit is powerful dog. Know what I'm saying?"  When asked what he meant, Johnson responded "see what happened to [S.W.]," and noted that he "was scared, when [Boree] called [him]" because he thought Boree could be the police.  Johnson stated that he had "just served" the victim at the nightclub.  He said that every time he served the

6

victim, he told her to "be careful" and that he could "cut [the drug]" and it would still be "the best out here." He told Boree "[s]he fucked it, she fucking did it dog" and "I didn't know she was on it heavy like that." Boree testified that the angle in which Johnson positioned himself in the car during that transaction led Boree to believe that Johnson probably had a firearm on him, but he did not see a bulge and Johnson did not mention that he had a firearm. Boree's concern was heightened because had received intel that Johnson had been seen with a gun several times before the drug deal. The government presented evidence in the form of a photo and video from Johnson's phone which showed the same model of Glock handgun Johnson was arrested with. GPS data indicated that the picture was taken at 355 Monument Road, where Johnson lived. The video was taken on September 25, 2017, just a few days before the deal with Boree. It depicts Johnson sitting in his car and placing a black handgun into his lap.

The government also introduced video clips and transcripts from an interview between Johnson and two detectives after his arrest. When one detective asked if Johnson had his "shit" on him during the first drug deal on September 29, Johnson said "Ah, yeah I had." He was again asked "You had it last time you served the white boy worried about . . . white boy might rob you." Johnson said, "Yes sir."

B. The Admission of the Post-Mortem Photographs of the Victim

7

The fourteen photographs at issue were admitted together as Government Exhibit 14-1 during the testimony of Wendy Meacham, the medical examiner investigator.  Meacham testified that the photographs were taken as a form of background information for the medical examiner to review before performing the autopsy.  The photographs depict the victim's body in a bent position lying on a bed.  The victim's pants are pulled down around her lower legs, but a towel is covering her midsection.  Her face is partially obscured by bedding.  The district court found that Government Exhibit 14-1 was admissible, along with other photos from Exhibit 14, because although a "dead body is a gross thing to see," the pictures were not "too offensive."

## II.    Standard of Review

We review the denial of a motion for acquittal and the sufficiency of the evidence *de novo*.  *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005).  All factual and credibility inferences are made in favor of the government.  *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000).  The evidence is sufficient to support a conviction if a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt.  *United States v. Diaz-Boyzo*, 432 F.3d 1264, 1269 (11th Cir. 2005).  The evidence does not have to exclude every reasonable hypothesis of innocence, and a

jury may choose between reasonable constructions of the evidence. *Hernandez*, 433 F.3d at 1334–35.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990). We may affirm for any reason supported by the record, even if not relied on by the district court. *United States v. Hall*, 714 F.3d 1270, 1271 (11th Cir. 2013).

### III.    Discussion

A. The Evidence was Sufficient on Count One

To convict Johnson under 21 U.S.C. § 841(a)(1) and (b)(1)(C), the government had to prove beyond a reasonable doubt that he knowingly and intentionally distributed a Schedule I or II drug that caused the death of another. [6] *See* 21 U.S.C. § 841(a)(1) and (b)(1)(C). To satisfy the second element, that the drug caused the death of another, the government had to prove that the use of the drug was the but-for cause of the victim's death. *Burrage v. United States*, 571 U.S. 204, 218–19 (2014).

Here, viewing the evidence in the light most favorable to the government, the evidence was sufficient for a reasonable jury to find Johnson guilty beyond a reasonable doubt of violating 21 U.S.C. § 841(a)(1) and (b)(1)(C). Based on our

---

[6] Fentanyl is a Schedule II substance. *See* 21 U.S.C. 812(c) Schedule II (b)(6). As a relatively new drug, methoxyacetyl fentanyl was temporarily classified as a Schedule I substance from October 26, 2017, until October 28, 2019. *See* 21 C.F.R. § 1308.11 Schedule I (h)(21).

review of the evidence presented at trial, it was reasonable for a jury to infer that: (1) the victim abused the substances fentanyl and methoxyacetyl fentanyl thinking they were heroin; (2) the victim bought fentanyl and methoxyacetyl fentanyl from Johnson, which Johnson knew to be "powerful"; and (3) the combination of fentanyl and methoxyacetyl fentanyl killed the victim.

Johnson argues that the evidence was "only" circumstantial that he sold drugs to the victim on the days leading up to her death. But in deciding whether the evidence was sufficient to meet a beyond a reasonable doubt standard, we do not distinguish between circumstantial and direct evidence.[7] *United States v. Tate*, 586 F.3d 936, 945 (11th Cir. 2009). Text messages and cell site information showed three separate meetings between Johnson and the victim in the two days prior to her work on September 16, after which she was found deceased. The cell site information showed that Johnson also made a trip to the vicinity of the nightclub where the victim worked in the hours leading up to her death. It was reasonable for the jury to believe that at least some of these meetings involved Johnson distributing drugs to the victim, as her text messages contained numerous drug references, and because Johnson admitted to Detective Boree that he dealt

---

[7] "[C]ircumstantial evidence is not testimony to the specific fact being asserted, but testimony to other facts and circumstances from which the jury may infer that the fact being asserted does or does not exist." *United States v. Henderson,* 693 F.2d 1028, 1031 (11th Cir. 1982).

10

drugs to the victim.  It was reasonable for the jury to infer that these transactions were for fentanyl and/or methoxyacetyl fentanyl because Johnson distributed methoxyacetyl fentanyl to Detective Boree shortly after the victim's death, methoxyacetyl fentanyl is a derivative of fentanyl, and both drugs look identical to heroin.  Johnson himself seemed to think that his drugs caused the victim's death, and certainly believed they were powerful, that users should be careful with them, and users could "cut" the drug and it would still be "the best out here."

Johnson also argues that evidence indicating the victim may have previously used a different drug dealer stretches the reasonable inferences into mere speculation.  But the government was not required to exclude every reasonable hypothesis of innocence.  *See Hernandez*, 433 F.3d at 1334–35.  The jury was free to choose among reasonable interpretations of the evidence, and one such interpretation was that Johnson sold the victim the drugs that were the "but for" cause of her death.  *See id.* at 1334; *Burrage*, 571 U.S. at 211–12.  Accordingly, the district court did not err in denying Johnson's motion for a judgment of acquittal as to Count One.

B.  The Evidence was Sufficient on Count Three

To convict a defendant under 18 U.S.C. § 924(c)(1)(A), the government must prove beyond a reasonable doubt that he (1) "use[d] or carrie[d] a firearm," and (2) "that the use or carrying was 'during and in relation to' a 'crime of

11

violence or drug trafficking crime.'" *Smith v. United States*, 508 U.S. 223, 228 (1993) (quoting 18 U.S.C. 924(c)(1)(A)).  A defendant is liable for carrying a firearm if he had it on his person *or* in his car during and in relation to a drug sale. *See Muscarello v. United States*, 524 U.S. 125, 131–32 (1998).

Here, the government provided direct evidence of Johnson's guilt in the form of a confession.[8]  A confession requires corroboration if it is to be used to support a conviction against the accused.  *Opper v. United States*, 348 U.S. 84, 92–93 (1954).  As Johnson points out, the corroboration must consist of "substantial evidence" which supports the truthfulness of the admission.  *Id.*  But the corroborating evidence need not be sufficient, independent of the admission, to establish that Johnson committed the crime.  *See id.* at 93. Here, we find there was sufficient corroborating evidence to bolster Johnson's confession.  The government

---

[8] Johnson claims that he "never admitted" to carrying a gun during the undercover transaction.  A review of the transcript disproves this contention.  Johnson admitted he had owned the pistol for "about a month."  When asked who Johnson was supposed to deal drugs to on the day of his arrest, October 2, Johnson said "I don't even know the dude name" [sic], but that he called for heroin, and he had served him once before.  When asked about the "last time" he dealt drugs to that same person, who was Detective Boree, Johnson said "Ah… last week." Johnson was asked "when you served him last week… was you worried about him robbing you?"  Johnson replied, "Hell yeah" and added that Boree was "[a] white boy."  The detective then asked, "did you have your shit on you then?" to which Johnson replied "Ah, yeah I had." The detectives praised him for his honesty and said, "it's rough on the street."  In the context of the conversation, Johnson's admission meant that he had a gun on the day he first served Detective Boree, September 29.  But if that were not clear enough, he repeats the confession later in the interview.  One of the detectives asked later "so… you've had that, ah, pistol just for a little while, about a month."  Johnson replied, "Yes sir."  Then the detective asked, "You had it last time you served the white boy worried about… white boy might rob you."  Again, given the history of the conversation, "last time" Johnson served the "white boy" was the September 29 transaction.  Johnson replied, "Yes sir."

presented photographic and video evidence that Johnson owned a gun before the

September 29 drug deal.  Detective Boree had heard reports that Johnson carried a

gun.  When Boree entered Johnson's car on September 29, he was concerned for

his safety because Johnson was postured in a way that made Boree think he might

have a gun nearby.  Finally, Johnson was found in possession of his gun when he

was arrested in the same car on October 2.  Regardless of whether this evidence

would be independently sufficient for a conviction, it is sufficient to corroborate

Johnson's confession.[9]

C.  Admission of the Photograph in Exhibit 14-1 Was Not Error

Generally, relevant evidence is admissible.  Fed. R. Evid. 401.  However, the

district court may "exclude relevant evidence if its probative value is substantially

outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence."  Fed. R. Evid. 403.  In reviewing evidence under

---

[9] Johnson relies on a case where we held as "plainly insufficient" the government's evidence that the defendant possessed a firearm during a robbery. *See United States v. Feliciano*, 761 F.3d 1202, 1212 (11th Cir. 2014).  However, the facts of that case are entirely distinguishable.  There, not only did no one see the defendant with a gun, the video surveillance of the robbery did not capture a gun and his two co-defendants testified positively that he did not carry a gun during the robbery. *See id.*  The government's only evidence was that the defendant had used a gun in a prior bank robbery, a gun which was then pawned—the defendant had not confessed. *See id.* at 1206.  But in our present case, the government presented evidence that Johnson used a gun on September 29 and introduced Johnson's confession that he did. *See, e.g., United States v. Billue*, 994 F.2d 1562, 1564 (11th Cir. 1993) (sustaining conviction for possession of a firearm even in the absence of confession where pawn shop owner could not remember if convicted felon brought in the firearm in question, nor did he see him hold or touch it, but the felon signed the sale form to the pawn shop).

Rule 403, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Edouard*, 485 F.3d 1324, 1344 n.8 (11th Cir. 2007) (quoting *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006)).  Rule 403 is "an extraordinary remedy" and "should be used only sparingly."  *Id*. (quoting *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir.2006)).

The district court did not abuse its discretion in admitting the photo. The photo was relevant to show the victim's cause of death was solely on account of the drug overdose and not alcohol, which Johnson disputed at the time, by highlighting the speed at which the drugs took effect—i.e., before the victim was done using the toilet.  It also showed the position that the investigators found the body and showed that the victim was still dressed in her work clothes from the nightclub—a detail that made it more likely she came straight home without having time to change and less likely she went to another location after work to purchase drugs, as Johnson tried to insinuate at trial.  Finally, although any picture of a dead body is hard to see, we agree with the district court that this photograph was not unduly offensive.  Any prejudicial value does not "substantially outweigh" the photo's highly probative value.[10]  F.R.E. 403.

---

[10] We also note that the much more graphic photographs, those in Exhibit 15, were not contested on appeal.

14

## IV.    Conclusion

Because of the evidence presented at trial, and because of the relevant and probative nature of the objected-to photograph, the district court did not err in denying Johnson's motions for judgment of acquittal and did not abuse its discretion in admitting the photograph of victim's body.  Thus, we affirm Johnson's convictions and the denial of his motions.

**AFFIRMED.**